In re RADIO–KEITH–ORPHEUM CORPORATION.

No. 386.

Circuit Court of Appeals, Second Circuit.
July 18, 1939.

Kommel & Rosenberg, of New York City (Nathan Rosenberg, David Stock, Myron Kommel, Donald Marks, and Mortimer Lee Burton, all of New York City, of counsel), for appellants Cassel and others.

C. Frank Reavis, of New York City (Martin D. Jacobs, of New York City, of counsel), for appellants Copia Realty Corporation and Fabian Operating Corporation.

John S. Stover, of New York City (Arthur N. Gleason, of Utica, N. Y., H. William Ihrig and Harry J. Allen, both of Milwaukee, Wis., Saltiel & Saltiel, of Chicago, Ill., and Lines, Spooner & Quarles, of Milwaukee, Wis., of counsel), for appellant Stirn.

Simpson, Thacher & Bartlett, of New York City (Hamilton C. Rickaby, Richard Jones, and Richard H. Demuth, all of New York City, of counsel), for appellee Atlas Corporation.

White & Case, of New York City (Carlos L. Israels, of New York City, of counsel), for appellees Hodges and others.

Before L. HAND, CHASE, and PATTERSON, Circuit Judges.

PATTERSON, Circuit Judge.

Radio-Keith-Orpheum Corporation is a holding company, organized in 1928. Some of the subsidiary companies are engaged in producing and distributing motion picture films, others in operating motion picture and vaudeville theatres. Heavy losses were encountered in 1931 and 1932, and in 1933 the company went into equity receivership. In 1934 it filed petition for reorganization as a debtor under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The petition was approved, and the business has since been conducted by a trustee. The debtor owed $1,800,000 secured notes, which were a first lien on practically all its assets, $12,-700,000 debentures and notes, referred to collectively as debentures, which were a second lien on the same assets, and unsecured obligations which for present purposes may be taken as totalling some $12,-000,000. The capital stock was somewhat in excess of 2,500,000 shares of common stock without par value. Interest was kept up on the first lien notes during the receivership and reorganization proceeding and the bulk of the principal paid off, but no payments of interest or principal were made on the debentures. In 1936 Atlas Corporation, a holder of debentures and of common stock, proposed a plan of reorganization. Under the 1936 plan holders of the first lien notes were not to be disturbed; holders of debentures were to receive new debentures at a reduced rate of interest for the same principal amounts, together with shares of new common stock; holders of unsecured claims were to receive new preferred and new common; stockholders were to receive new common. It is unnecessary to consider the 1936 plan in detail, for although it was accepted by the requisite majorities of debenture holders, unsecured creditors and stockholders, and was approved by a special master who took testimony and made a report, it was never acted on by the district court. A period of poor earnings had come along, and it was supposed by those promoting the plan that the debtor could not support the requirements for interest and sinking fund on the proposed debentures and for dividends on the proposed preferred stock. Atlas Corporation put forward another plan in May, 1938. This plan, though termed an amended plan, was along different lines and was in effect a new plan. The special master held further hearings and in July, 1938, recommended the plan as fair, equitable and feasible. It received the support of the necessary majorities of the classes of creditors affected by it and of the stockholders, and the district judge by the orders appealed from confirmed it.

In brief outline the plan is this: The first lien notes, now reduced to $50,000, are not affected. The holders of debentures, outstanding for $12,700,000 in principal

amount and about $5,000,000 in unpaid interest at six percent, are to receive for each $100 of debentures one share of 6 percent cumulative preferred stock of $100 par value, and the choice of either five shares of common stock or .43 of a share of preferred stock, this to cover the unpaid interest on the debentures down to the time when the cumulative dividend feature of the preferred stock becomes effective. The preferred stock on winding up has precedence over the common to the extent of $100 and unpaid dividends. Each share of preferred is convertible for eight years into eight shares of common. The preferred has voting rights, and in case five quarterly dividends shall be passed, the preferred as a class shall elect one-third of the directors. There is to be a sinking fund for retirement of the preferred stock. The debtor may not create funded debt in excess of $3,000,000 if the holders of one-third of the preferred object. The holders of unsecured claims are to receive for each $100 without interest ten shares of common stock. The unsecured claim of Rockefeller Center, Inc., reported by a special master in the equity receivership for allowance at over $9,000,-000 but never passed on by the district court, is to be compromised at $4,150,000 and is to be treated like other unsecured claims. Common stockholders will receive for each share of old stock one-sixth of a share of common and also an option warrant entitling the holder to purchase more common at designated prices within designated periods. Additional shares of common are to be sold under an underwriting agreement in order to furnish the debtor with $1,-500,000 for new working capital.

### Appeal of Cassel and Others

The appellants Cassel and others own a substantial number of debentures. They maintain that the plan is unfair and inequitable to holders of debentures. They point out that the debentures are now secured by a lien on practically all the debtor's assets, having a book value considerably in excess of principal and unpaid interest on the debentures, subject only to a prior lien of trifling amount, and that average annual earnings of the debtor for the last four years have been greater than interest requirements on the debentures, with a good margin over. They say that the present plan was based upon the poor earnings shown for the first few months of 1938. It is doubtless true that the proponent was persuaded by the debtor's poor showing in the latter part of 1937 and the first part of 1938 to drop a plan involving issuance of new debentures in place of old debentures and to project a plan for preferred stock in place of old debentures. The appellants also point out that in the course of the proceeding for reorganization the debtor and subsidiaries have made substantial payments in reduction of funded debt, chiefly of subsidiary debt, and that such reductions have improved the security behind the existing debentures. On these and other premises a forceful argument is made that it is unfair to the debenture holders to tender them preferred stock in place of their present secured claims.

On the other hand, the debtor is a holding company, the top of a structure in which a number of the lower elements still have large funded debts of their own to provide for. Those debts have precedence of course over the debts of the parent company, so far as the assets and earnings of the particular subsidiaries are concerned. As for earnings, the career of the debtor over the ten year period of its existence shows that earnings have been volatile and sensitive to general business conditions. Large profits have been earned in some years and heavy losses incurred in others.[1] A factor of practical importance is that for various reasons the entire net earnings of the underlying companies, though treated as consolidated net earnings of the debtor, are not presently available for meeting interest on obligations of the debtor. For example, one of the large subsidiaries has preferred stock in the hands of the public, on which there are accumulated dividend arrears for several years; in the case of this subsidiary the debtor for the time being can count on

---

[1] The consolidated profit and loss statement from 1932 to 1938 shows, before interest on the debtor's existing obligations:

| | | |
|---|---|---|
| 1932 | loss | $4,949,000. |
| 1933 | loss | 2,995,000. |
| 1934 | profit | 249,000. |
| 1935 | profit | 1,224,000. |
| 1936 | profit | 2,994,000. |
| 1937 | profit | 2,299,000. |
| 1938 (first six months) | loss | 97,000. |

only so much of the earnings as may be declared on the minority of preferred stock owned by it. On a survey of the entire situation we cannot say with assurance that over the years the available earnings of the debtor would suffice to meet interest and amortization charges on a debt burden of some $18,000,000, the amount of the old debentures and present unpaid interest, nor can we say that a plan which left the debentures and unpaid interest outstanding as a fixed debt charge was not only feasible but was the one and only plan that would deal fairly with holders of debentures. Failure to meet the reorganized debt charge would result in another reorganization.

It must not be overlooked that the plan as it stands preserves to debenture holders their existing priority over unsecured creditors and stockholders, who are to get common shares, and in case debenture holders elect to take the additional fraction of a preferred share rather than common shares for their unpaid interest, the priority covers not merely unpaid principal but also all unpaid interest on the debentures. In this respect the plan is quite different from that in In re Day & Meyer, Murray & Young, Inc., 2 Cir., 93 F.2d, 657, relied on by the appellants. Whether such priority in the full amount of principal and interest for senior claimants is always a requisite of fairness need not be decided. Here the precedence of the debentures was given full recognition. The debenture holders, while they will have no lien, will have a security with first claim on assets and first claim on earnings for the full amount now owed to them, subject of course to the possibility of future borrowing. The special master in an able report found that the value of the new preferred stock on an assets basis and an earnings basis was a fair equivalent for the rights to be surrendered by the debenture holders, and the district judge confirmed the report. Under the conditions of this case, the plan having met with the approval of the holders of more than two-thirds the debentures, the argument that it is inherently unfair to debenture holders cannot be sustained.

■■ The appellants urge that the lien of the debentures may not be disturbed on reorganization except on payment of cash or its immediately realizable equivalent; otherwise the provisions of section 77B and the Fifth Amendment, U.S.C.A.Const., it is said, are not conformed to. The argument loses sight of the fact that the debentures, while a lien on property with a going value in excess of the debt, are not now a lien on cash or its immediately realizable equivalent for the full amount of the debt. A further flaw in the argument is that it is based on a provision in the statute, paragraph (b) (5), which has no application to the case before us. Corporate reorganization under section 77B is a development from the older bankruptcy composition. In re Central Funding Corporation, 2 Cir., 75 F.2d, 256. It rests in the main on consent of the parties in interest, the parties being marshalled into classes and the consent of the designated majority of a class standing as the consent of the entire class. See Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 585, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106. Protection to minorities is afforded by the requirement that the reorganization be found by the court to be fair, equitable and feasible. The statute goes beyond the idea of a composition, however, in the feature found in paragraph (b) (5), that the rights of a class of creditors may be affected without consent of the two-thirds majority where the plan makes provision for the transfer or sale of the debtor's property subject to their claims, or for sale free of claims and transfer of claims to the proceeds, or for appraisal and payment in cash, or for other fair and equitable protection. In a case where consent is lacking and the reorganization does not embody a composition between debtor and creditors, the substitute tendered must doubtless be of an "indubitable equivalence". In re Murel Holding Corporation, 2 Cir., 75 F.2d 941. See, also, Security-First National Bank v. Rindge Land & Navigation Co., 9 Cir., 85 F.2d 557, 107 A.L.R. 1240; Texas Hotel Securities Corporation v. Waco Development Co., 5 Cir., 87 F.2d 395. We do not say that with a company like Radio-Keith-Orpheum, preferred stock could be forced on secured creditors without consent of two-thirds. That is not the present situation. The approval of more than two-thirds of the debenture holders was given, and the case presented is the usual one of composition under supervision of the court, in which the provisions of paragraph (b) (5) of the statute play no part. In re Los Angeles Lumber Products Co., 9 Cir., 100 F.2d 963. The statute gives explicit power to modify the rights of creditors, secured or unsecured, by the issuance of new securities, and it is commonplace in a re-

organization to displace secured bonds by issuance of preferred stock on approval by two-thirds of the bondholders affected and on preservation of priorities, the court finding that on the facts the plan is fair to bondholders.

The district court was not called on to say that the plan was the best or fairest that could be drafted. The problems confronting the parties were not easy of solution. The corporate structure was intricate. The demands of the secured creditors, unsecured creditors and stockholders were conflicting. The demands were satisfied in a way that met with the approval of the requisite majorities of each group. The plan did not break the priority of the debentures over unsecured creditors and stockholders. Under the circumstances we cannot say that the rights of the debenture holders were sacrificed in favor of junior parties.

■ The statement is made that the proponent of the plan and associates have two-thirds of the debentures and a majority of the stock, and that their vote for the plan as debenture holders was colored by their stock interest. The act requires that acceptances of plan be in good faith, and if there were basis for the charge that the holding of stock by debenture holders was the factor that brought about the acceptance of the plan by two-thirds of the debenture holders, the case might be different. But we find no basis for the charge. Under the plan the holder of a $100 debenture will receive, in case he wishes to take common stock, 78 times as much stock as the holder of one share of old stock will get. With old stock getting so little under the plan, we see no reason to suppose that the plan was weighted in favor of old stock. On the appeal of Cassel and others the orders of the court below will be affirmed.

### Appeal of Copia Realty Corporation and Fabian Operating Corporation.

■■ The appeal of Copia Realty Corporation and Fabian Operating Corporation brings up the fairness of the treatment given to contingent claims in the plan. These appellants are landlords who leased theatres to one of the debtor's subsidiaries on the debtor's guaranties that the subsidiary would pay the rent reserved. There are no defaults under the leases, and there has never been occasion for resort to the guaranties given by the debtor. For contingent or indeterminable claims, of which there were a number in addition to those of the appellants, the proposed plan provided in effect that in the event of a claim becoming fixed after confirmation, the claimant might assert it at such later time, any recovery to be limited to the amount that would have been allowed if default had occurred prior to confirmation and the debtor to have the right to satisfy the claim either in cash or in common stock of the same amount that the claimant would have received if he had established his claim as an unsecured claim prior to confirmation, that is to say, ten shares for each $100 of the claim. The appellants objected to this in the district court, partly on the ground that they had no protection against later decline in value of the shares. The district judge approved of the provision in general, but sought to meet the objection of the appellants by requiring that the number of shares of common stock to be delivered in satisfaction should be determined according to the market price current at the time of default by the debtor. The plan was modified to include such a provision. The appellants insist that even with this change the plan is prejudicial to contingent claimants in their position and unduly favorable to unsecured creditors with accrued claims and to stockholders. They ask for either a continuance of the guaranties or a security deposit in cash of at least three years' rent.

The claims based on the debtor's guaranties were wholly contingent and indeterminate in amount, there having been no default under the leases and no predictable prospect of a default. In ordinary bankruptcy such claims would not be provable or dischargeable to any extent. In re F. & W. Grand 5-10-25 Cent Stores, 2 Cir., 70 F.2d 691. In a proceeding under section 77B, however, they are claims subject to reorganization. The section provides in paragraph (b) that "'creditors' shall include for all purposes of this section and of the reorganization plan, its acceptance and confirmation, all holders of claims of whatever character against the debtor or its property, including claims under executory contracts, whether or not such claims would otherwise constitute provable claims under this title." The appellants therefore were not as matter of law entitled to stand aloof and obtain a continuance of the guaranties unaffected by reorganization, the equivalent of a preference for them over unsecured creditors with accrued or determinable claims. What they were entitled

to was treatment as nearly like that accorded to ordinary unsecured creditors as the circumstances permitted, and we are of opinion that the plan extends that sort of treatment to them. The demand for a cash deposit of the maximum amount of their claims is a call for better treatment, a demand which would render it impossible in many cases to effect a reorganization. The plan as it stands is fair to these parties, and their appeal fails.

## Appeal of Stirn

■■ The remaining appeal is that of Stirn, a stockholder. Stirn criticizes the reorganization on a number of points. The principal point is that certain charter amendments made by the debtor in 1931 relative to Class A stock were ineffective and that in the reorganization Stirn as a holder of Class A stock should have been classified ahead of holders of common stock who had surrendered Class A stock or had otherwise waived their rights. Prior to 1931 the debtor, a Maryland company, had shares of Class A stock and of Class B stock outstanding, both being without par value. The Class A stock had advantages over the Class B; we will assume that Stirn is correct in stating that the Class A stock was in effect a preferred stock. The amendments proposed in 1931 were to reduce the outstanding Class A stock to one-fourth, so that each holder of one share would receive one-fourth share, to cancel the outstanding Class B stock, and to reclassify the authorized shares into simple common stock without par value. These amendments were carried by vote of more than two-thirds of the Class A stock and by unanimous vote of the Class B stock. The appellant presses a provision of the Maryland law that amendments which change "contract rights" of stockholders shall be valid only when authorized by the holders of all outstanding stock. The point is the barest technicality. With the outstanding Class B stock effectually extinguished by unanimous consent of the holders of it, the contract rights of the Class A holders were not diminished by a mere reduction in the number of Class A shares outstanding, or by change of name to common stock. The change was obviously beneficial to Class A stockholders. The special master gave careful consideration to Stirn's arguments and found that the 1931 amendments were valid. He found also that Stirn was barred by laches from assailing the efficacy of the amendments. We are in accord with the special master on both grounds.

■ Another argument pressed by Stirn is that the debentures should have been held invalid, at least to the extent of 45 percent of their face amount, and that the plan is unfair to stockholders because it treats the debentures as valid claims for full face amount. In 1931 the debtor, being in dire need of cash, made an agreement with Radio Corporation of America by which the latter underwrote an offering of debentures and common stock to stockholders. The offer, in effect, was that for $100 a stockholder would get a $100 debenture and 15 shares of common stock, and of the $100 paid in $55 would be allocated to the debenture and $45 to the stock. The stockholders not responding to the offer to the extent expected, the Radio Corporation was obliged to take up the bulk of the debentures and stock offered. The debentures have since been actively traded. It is contended here, as it was in the district court, that the debentures should have been disallowed to the extent of 45 percent of their face value.

The debentures, it is true, were issued at a heavy discount. But we are referred to no provision of law forbidding the issuance of bonds by corporations at a discount, and the general rule is that corporations may borrow at a discount. Dickerman v. Northern Trust Co., 176 U.S. 181, 20 S.Ct. 311, 44 L.Ed. 423; Gamble v. Queens County Water Co., 123 N.Y. 91, 25 N.E. 201, 9 L.R.A. 527. In this case the offer of debentures at the discount complained of was made to the debtor's stockholders. We see no reason to doubt the validity of the debentures for full face value.

The other points raised by the Stirn appeal have been considered. There is not sufficient merit in them to warrant separate discussion.

Affirmed.