In the Matter of CHICAGO, MILWAU-
KEE, ST. PAUL & PACIFIC RAIL-
ROAD COMPANY, Debtor.

Appeal of CMC HEARTLAND
PARTNERS.

No. 92–2060.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 18, 1993.

Decided Sept. 20, 1993.

Daniel R. Murray, Randall E. Mehrberg, Michael T. Brody (argued), Jerold S. Solovy, Barry Sullivan, and Diane I. Bonina, Jenner & Block, Chicago, IL, for appellant.

Jerome B. Meites, McDermott, Will & Emery, Chicago, IL, Timothy R. Thornton (argued), and Janel E.P. LaBoda, Briggs & Moran, Minneapolis, MN, for appellee.

Leonard Gesas, and James M. Amend, Kirkland & Ellis, Chicago, IL, for debtor.

Before COFFEY and ROVNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ILANA DIAMOND ROVNER, Circuit Judge.

This is another in the long line of appeals relating to the reorganization of the Chicago, Milwaukee, St. Paul & Pacific Railroad Company (the "Milwaukee Road"). Today we are presented with the perplexing question of when a federal court should exercise its discretion to abstain in deference to a state proceeding under 28 U.S.C. § 1334(c)(1). Milwaukee Road's successor, CMC Heartland Partners ("CMC"), asked the district court to enjoin a Minnesota state proceeding initiated by MT Properties, Inc. ("MT"), contending that it violated the terms of the consummation order entered at the close of the Milwaukee Road reorganization. The court abstained from considering CMC's petition until the Minnesota court could decide an issue of state law that the lower court deemed vital to resolution of the petition. Yet, because the district court can decide as

a matter of federal bankruptcy law whether the Minnesota litigation violates the consummation order without the need to decide any issue of state law, we find that the court abused its discretion in abstaining. We therefore reverse and remand for further proceedings.

## I. BACKGROUND

This complicated story began in 1977, when the Milwaukee Road petitioned for reorganization under section 77 of the Bankruptcy Act of 1898, formerly 11 U.S.C. § 205.[1] The United States District Court for the Northern District of Illinois (the "reorganization court") presided over the reorganization proceedings. It approved Milwaukee Road's plan of reorganization on July 12, 1985, and established a bar date of September 10, 1985 for the filing of any claims, including contingent claims, that may have arisen against Milwaukee Road, its bankruptcy estate, or the bankruptcy trustee during the reorganization. On July 22, 1985, notice of this bar date was mailed to all of Milwaukee Road's known creditors and was published in the national edition of The Wall Street Journal for the benefit of potential or unknown creditors.

The reorganization court entered a consummation order on November 12, 1985, that barred and forever discharged all contingent and non-contingent claims for which no timely filing had been made. (R. 3 ¶ 7.) The consummation order included an injunction against the pursuit of any action relating to such a claim. (*Id.* at ¶ 13.) The reorganization court relinquished jurisdiction over the

reorganization as of the consummation date, but expressly retained exclusive jurisdiction over certain matters, including the consideration of any claims or contingent claims against the debtor or the trustee. (*Id.* at ¶ 9.)[2] When the consummation order became effective on November 25, 1985, title to Milwaukee Road's assets vested in its successor CMC Real Estate Corporation.[3]

This appeal arises from MT's attempt to recover depreciation expenses purportedly owed by CMC. The genesis of this alleged obligation involves a predecessor to MT—the Minnesota Transfer Railway Company ("Minnesota Transfer"), a terminal railroad company that owned and operated a rail corridor and switch yard in Minneapolis and St. Paul. Minnesota Transfer's "terminal" served as a connecting point or switching station for eastern and western railroads. During the relevant time period, Minnesota Transfer was jointly owned and operated by five railroads, including the Milwaukee Road. These railroads operated Minnesota Transfer pursuant to a joint facility agreement, which provided that the owners would share expenses based on either their ownership shares or their use of the joint facility.

A federal tax law allows a terminal railroad company such as Minnesota Transfer to pass its tax benefits and liabilities through to its owner/shareholders. *See* 26 U.S.C. § 281. Before 1981, the tax code included a special depreciation rule that required railroads to depreciate their investments in track structure when a structure was retired or replaced, rather than over the life of the structure, as with most capital investments. This

1. As we have explained in previous encounters with the Milwaukee Road reorganization, the provisions of the Bankruptcy Act of 1898, rather than those of the Bankruptcy Reform Act of 1978, control this reorganization because the petition was filed prior to October 1, 1979. *See, e.g., In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 3 F.3d 200, 202 (7th Cir.1993); *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 974 F.2d 775, 780 (7th Cir.1992); *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 830 F.2d 758, 759 n. 1 (7th Cir.1987); *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 791 F.2d 524, 525–26 (7th Cir.1986).

2. The reorganization court later confirmed that it retained jurisdiction to enforce the terms of the

consummation order. (R. 4, at 3 ¶ 3.) CMC retained the right to petition the reorganization court "for injunctive relief if anyone seeks to collaterally attack [the consummation order], either before this or another court, by proceeding against the party that has been relieved and discharged of all liability relating to a particular claim, matter or obligation." (*Id.* at 4 ¶ 4.)

3. In June 1990, CMC Real Estate Corporation transferred its assets and liabilities to CMC Heartland Partners. Both CMC Real Estate Corporation and CMC Heartland Partners were and are real estate holding companies. The Milwaukee Road's railroad operating assets were sold during the reorganization.

provided railroads a 100 percent depreciation expense when a section of track was retired or replaced but no depreciation expense over the life of the track. At any given time, a railroad might therefore have significant capital outlays for which no depreciation expense had yet been allowed (its "frozen base").

In 1981, however, Congress changed this depreciation rule to permit railroads to depreciate their capital investments over the life of track structures. The 1981 amendment also provided railroads a one-time opportunity to depreciate their "frozen base" over a period of at least five years, so that Minnesota Transfer could depreciate its entire existing track structure over a five-year period. This tax benefit would in turn be passed on to Minnesota Transfer's shareholders in accordance with the joint facility agreement. At the same time, because each shareholder was obligated to pay its share of Minnesota Transfer's expenses, including depreciation expenses, on a monthly basis, the new rules also would lead to substantial shareholder debts to Minnesota Transfer.

In response to the 1981 amendments, Minnesota Transfer's Board of Directors resolved to depreciate the terminal railroad's frozen base and decided that the corresponding expense would be

> ... paid by the Company's stockholders in proportion to their stock ownership, the amounts thereof to be payable upon demand by unanimous vote of the entire Board of Directors and ... to be carried as a deferred asset on the books of the Company.

(the "1982 Board Resolution" (R. 10, Ex. D, at ¶ 4.).) This arrangement allowed the shareholders, including the Milwaukee Road, to benefit from the depreciation expense without having to pay the expense until some undefined future point. Until its shareholders unanimously agreed that the depreciation expense should be paid, Minnesota Transfer would carry the shareholder debt as a deferred asset. Although the 1982 Board Resolution predated the consummation order, Minnesota Transfer did not assert a claim for this deferred depreciation in the Milwaukee Road reorganization.

On February 17, 1987, Minnesota Transfer merged into the St. Paul Union Depot Company ("SPUD"), and the surviving corporation was MT. CMC dissented from the merger, and under the Minnesota Dissenters' Rights Statute, it became entitled to the "fair value" of its Minnesota Transfer shares. MT acquired CMC's interest in Minnesota Transfer in accordance with the statute by the end of February 1987, but the parties only recently settled the "fair value" issue after years of litigation. *See MT Properties, Inc. v. CMC Real Estate Corp.*, 481 N.W.2d 383 (Minn.Ct.App.1992).

On November 17, 1988, MT's Board unanimously voted, pursuant to Minnesota Transfer's 1982 Board Resolution, to require the former Minnesota Transfer shareholders to repay their deferred depreciation expenses (the "1988 Board Resolution").[4] Pursuant to that resolution, MT demanded that CMC pay a $177,361.44 share. CMC refused to pay on the ground that its obligation to repay deferred depreciation was released when MT purchased CMC's Minnesota Transfer stock in 1987.

In April 1990, MT sued CMC in Minnesota state court. *See MT Properties, Inc. v. CMC Real Estate Corp.*, No. C2–90–5679. CMC moved for summary judgment, arguing that the stock transfer preceded the 1988 Board Resolution and that CMC's obligation to repay the depreciation expense passed with the Minnesota Transfer stock. MT responded that the 1982 Board Resolution was in the nature of a contract between Minnesota Transfer and its shareholders and that the obligation to repay therefore stayed with the contracting entities rather than passing with the shares. On October 18, 1991, the Minne-

---

4. For MT's current shareholders, this resulted in only a paper transaction, for although the shareholders owed deferred depreciation expenses, MT also owed these shareholders significant amounts in unreimbursed advances that had accumulated over the years. These debts to SPUD shareholders existed at the time of the SPUD/Minnesota Transfer merger, and MT assumed SPUD's obligations. Thus, the "payment" of deferred depreciation expenses served only to reduce MT's existing debt to its shareholders—that is, no money actually changed hands.

sota court denied CMC's motion for summary judgment without stating its reasons.

On November 27, 1991, CMC petitioned the reorganization court for injunctive relief. Invoking the court's continuing jurisdiction to enforce the consummation order, CMC argued that MT's claim in the Minnesota action arose, if at all, on September 7, 1982, when Minnesota Transfer's Board passed the 1982 Resolution. Because under that view the claim arose prior to the September 10, 1985 bar date, Minnesota Transfer should have filed its claim in the reorganization, and its failure to do so discharged the claim. MT argued that its claim was not barred and also asked the reorganization court to abstain from hearing the petition pursuant to 28 U.S.C. § 1334(c)(1).[5]

On April 7, 1992, the reorganization court denied CMC's motion for an injunction and determined to abstain. CMC then requested an injunction pending this appeal, but the court denied that motion as well without articulating its reasons. When CMC renewed its motion here, we ordered a limited remand, asking the reorganization court to provide its reasons for denying an injunction pending appeal. *See* Fed.R.App.P. 8(a). We also noted that the reorganization court had not explained its decision to abstain but had merely adopted "the reasons set forth in MT Properties' memorandum." (R. 19.) We reiterated that such an order was inadequate (*see DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir.1990), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)), and required the reorganization court on remand to also provide its reasons for denying injunctive relief and for abstaining.

The reorganization court then vacated its April 7, 1992 denial of injunctive relief but reiterated its intention to abstain. Because CMC had filed its petition nineteen months after initiation of the state proceeding and only after the denial of its motion for summary judgment there, the reorganization court believed that CMC was forum shopping. The reorganization court also observed that considerations of judicial economy counseled it to abstain, given the significant progress of the state court litigation.[6] Finally, the court decided to abstain because MT's claim appeared to involve a significant state law issue as to the origin of the alleged obligation to repay depreciation expense. The reorganization court therefore abstained "until the Minnesota proceedings have resolved the issue of the origin of CMC's payment obligation." *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, No. 77 B 8999, 1992 WL 281514, 1992 U.S. Dist. LEXIS 15161, slip op. at 6 (N.D.Ill. Sept. 29, 1992).

In the same order, the reorganization court again denied CMC's motion for an injunction pending appeal. The court relied primarily on the fact that the Minnesota court itself had already declined such a request. On the basis of collateral estoppel or alternatively the doctrine of comity, the reorganization court deferred to the state court's ruling and declined to issue an injunction. When CMC then renewed its motion before this court, we enjoined MT from pursuing the Minnesota action pending this appeal.

## II. ANALYSIS

We review the reorganization court's decision to abstain under section 1334(c)(1) for an abuse of discretion. *In re Pan Am. Corp.*, 950 F.2d 839, 844 (2d Cir. 1991); *In re Eastport Assoc.*, 935 F.2d 1071, 1075 (9th Cir.1991); *see also Storment v. O'Malley*, 938 F.2d 86, 88 (7th Cir.1991); *Property & Casualty Ins. Ltd. v. Central*

---

**5.** Although federal district courts have original (but not exclusive) jurisdiction over all civil proceedings arising in or related to reorganization proceedings (28 U.S.C. § 1334(b)), section 1334(c)(1) provides that

> [n]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**6.** The court noted that

> [h]ad CMC promptly brought its petition for injunctive relief, this court might have been more inclined to address the merits of the petition. Doing so now, after CMC's inexplicable delay, would be a waste of the Minnesota court's time and judicial resources.

*In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, No. 77 B 8999, 1992 WL 281514, 1992 U.S.

*Nat'l Ins. Co.*, 936 F.2d 319, 321 (7th Cir. 1991). "Although this is a deferential standard, we must nonetheless conduct a 'meaningful review' of the district court's decision." *Wilfong v. United States*, 991 F.2d 359, 364 (7th Cir.1993) (quoting *Creske v. Comm'r of Internal Revenue*, 896 F.2d 250, 252 (7th Cir.1990)). In doing so, we are mindful that federal courts generally should exercise their jurisdiction if properly conferred and that abstention is the exception rather than the rule. *Property & Casualty Ins. Ltd.*, 936 F.2d at 320–21; *see also New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359, 109 S.Ct. 2506, 2513, 105 L.Ed.2d 298 (1989); *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236, 104 S.Ct. 2321, 2326, 81 L.Ed.2d 186 (1984).

## A. Discretionary Abstention Under Section 1334(c)(1)

■ Section 1334(c)(1) is somewhat oblique in delineating the criteria that would support a discretionary decision to abstain. *See Pan Am.*, 950 F.2d at 845. The statute speaks only in the most general terms of the "interest of justice," the "interest of comity," and "respect for State law." However, discretionary abstention under section 1334(c)(1) is "informed by principles developed under the judicial abstention doctrines, and courts have usually looked to these well-developed notions of judicial abstention when applying section 1334(c)(1)." *Pan Am.*, 950 F.2d at 845; *see also Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 833 (5th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 2963, 125 L.Ed.2d 663 (1993); *In re Eastport Assoc.*, 935 F.2d at 1078–79 & n. 7.

■■ To provide more concrete guidance to courts considering section 1334(c)(1) abstention, the Ninth Circuit has identified the following relevant factors:

(1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties.

*In re Eastport Assoc.*, 935 F.2d at 1075–76 (quoting *In re Tucson Estates, Inc.*, 912 F.2d 1162, 1167 (9th Cir.1990)).[7] Courts should apply these factors flexibly, for their relevance and importance will vary with the particular circumstances of each case, and no one factor is necessarily determinative. At the same time, because section 1334(c)(1) is concerned with comity and respect for state law, whether a case involves unsettled issues of state law is always significant. *See Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 483, 60 S.Ct. 628, 630, 84 L.Ed. 876 (1940); *Pan Am.*, 950 F.2d at 846; *see also In re L & S Indus., Inc.*, 989 F.2d 929, 935 (7th Cir.1993) ("Under bankruptcy law the presence of a state law issue is not enough to warrant permissive abstention, but it nevertheless is a significant consideration."); *In re United Sec. & Communications, Inc.*, 93 B.R. 945, 960 (Bankr.S.D.Ohio 1988); H.R.Rep. No. 595, 95th Cong., 1st Sess. 51 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6012.[8]

Dist. LEXIS 15161, slip op. at 6 (N.D.Ill. Sept. 29, 1992).

7. This test was developed in the context of a proceeding under the Bankruptcy Reform Act of 1978 (thus, for example, it refers to a "core" proceeding), and we previously have referred to it in that context. *See In re L & S Indus., Inc.*, 989 F.2d 929, 935 (7th Cir.1993). But we think the relevant factors may appropriately be applied to a proceeding governed by the Bankruptcy Act of 1898, because for abstention purposes, the relevant considerations are no different.

8. If a state law issue is not unsettled, or if there is no state authority directly on point, then the bankruptcy court is qualified to resolve the issue,

■ The reorganization court here listed a number of factors similar to those we have set forth above, but it decided to abstain for essentially three reasons: (1) CMC was engaged in forum shopping; (2) abstention would serve judicial economy; and (3) CMC's petition for injunctive relief involved a significant question of state law that should be resolved by the Minnesota court. 1992 WL 281514, 1992 U.S. Dist. LEXIS 15161, slip op. at 4–5. Moreover, the district court abstained only "until the Minnesota proceedings have resolved the issue of the origin of CMC's payment obligation." *Id.* at 6. Thus, because the propriety of abstention here primarily turns on whether CMC's petition would require resolution of an unsettled issue of state law, we begin there.

*B. State Law Issue*

The reorganization court concluded that MT's claim, and thus CMC's petition, presented a state law question as to "the origin of CMC's obligation to pay the depreciation expense." *Id.* at 5. The reorganization court reasoned that the Minnesota court's denial of CMC's motion for summary judgment indicated unsettled factual issues as to the origin of the repayment obligation and that those issues were best left for resolution by the Minnesota court. Were it actually necessary for the reorganization court to determine when MT's cause of action arose, we might agree that discretionary abstention would be appropriate here. But we believe that issue is not central to the question presented by CMC's petition, as MT has conceded that it is asserting a contractual claim based in part on the 1982 Board Resolution. Accepting the stated basis for MT's claim, therefore, we see no state law issue for the reorganization court to decide. The relevant question is not when MT's claim arose as a matter of Minnesota law, but rather, whether Minnesota Transfer had a contingent claim as a matter of federal bankruptcy law prior to the bar date.

Central to our holding is the nature of the claim that MT asserts in Minnesota. We must therefore consider how MT has defined its right to recovery against CMC, which we may do only by considering its Minnesota pleadings. In a brief three-page complaint, MT characterized its claim as contractual, referencing both the 1982 Board Resolution providing how the deferred depreciation expense would be treated, and the 1988 Board Resolution actually demanding repayment. (R. 10, Ex. D.) The complaint alleged that MT, pursuant to the 1988 Board Resolution, had demanded "repayment of the depreciation expense amounts that had been conveyed to each shareholder" in accordance with the 1982 Board Resolution and that only CMC had failed to satisfy its obligation. (*Id.* at ¶ 7.) MT therefore requested recovery of the amount of depreciation expense conveyed to CMC or its predecessors.

CMC moved for summary judgment, arguing that the obligation to repay the depreciation expense passed with the Minnesota Transfer stock. MT responded that the repayment obligation was a contractual duty that originated with the 1982 Board Resolution. (*See* R. 11 Ex. F.) For example, MT argued that

> [t]he 1982 resolution passed by the Board of [Minnesota] Transfer memorializes the agreement by and among [Minnesota] Transfer and each of its five shareholders. That Agreement provides that the shareholders would receive a benefit in the form of depreciation credits which would be repayable upon demand authorized by a unanimous vote of the Board. *Thus, the obligation to repay the depreciation credits was a contractual obligation undertaken by each shareholder pursuant to an agreement with [Minnesota] Transfer and the other shareholders.*

(*Id.* at 9–10 (citations omitted) (emphasis added).) MT further argued that this obligation remained with CMC, as the Milwaukee Road's successor, even after it relinquished its Minnesota Transfer shares:

and there is no need to refer it to a state court. *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,* 654 F.2d 1218, 1221–22 (7th Cir.1981); *In re Chicago & N.W. Ry. Co.,* 127 F.2d 1001, 1004 (7th Cir.1942), *cert. denied,* 317 U.S. 659, 63 S.Ct. 59, 87 L.Ed. 530 (1942); *In re Kaleidoscope, Inc.,* 25 B.R. 729, 742 (N.D.Ga.1982).

The contracting parties clearly did not intend that the rights and obligations under this contract attach to and pass with the [Minnesota] Transfer shares. *Rather, this contractual obligation was intended to be binding upon the five shareholders of [Minnesota] Transfer.* Because the obligation was not attached to the shares of [Minnesota] Transfer, it could not have passed to MT when CMC surrendered its stock in exercise of its statutory dissenter's rights.

(*Id.* at 10 (emphasis added) (citations omitted).) MT therefore requested that the 1982 Board Resolution "memorializ[ing] the agreement between the shareholders and [Minnesota] Transfer ... *be enforced according to its terms.*" (*Id.* at 13 (emphasis added).) To do otherwise, MT argued, would permit CMC to renege on its agreement to repay deferred depreciation after it had accepted the benefit of that bargain for a number of years. (*Id.* at 14.)

MT has retreated here from the arguments it made in Minnesota, for it now contends that it never conceded there

that the obligation to repay arose exclusively in 1982. The 1982 resolution merely allocated the depreciation expense to the [Minnesota] Transfer shareholders and provided that repayment would occur only after unanimous action by the Board. No obligation could arise solely from that Board action because every shareholder had veto power over the imposition of any obligation to repay the frozen base expense. The obligation did not and could

not fully manifest itself until the 1988 unanimous action of the Board which demanded payment.

(MT Br. at 22.) [9] Moreover, MT maintains that the Minnesota court never decided that its claim arose exclusively in 1982.[10] CMC agrees and is even willing to grant MT the benefit of the above "clarification" to its position here, for CMC does not dispute that under Minnesota law, a cause of action for breach of contract does not arise until the contract has been breached. (CMC Br. at 26.) Here, that would only have occurred when CMC refused to comply with the 1988 Board Resolution demanding payment. Yet, when the "contract" may or may not have been breached is immaterial for our purposes. The more salient point is that MT has made a contract claim based on the 1982 Board Resolution. Even if that claim was not actionable until 1988, after consummation of the Milwaukee Road reorganization, it may nonetheless have constituted a contingent claim that should have been filed in the reorganization. This is a question for the reorganization court to decide, and it may do so without reaching any state law question as to whether the duty to repay the depreciation expense passed with the Minnesota Transfer shares or remained with CMC as a contractual obligation. The reorganization court can therefore resolve CMC's petition without deciding any issue of state law.

## C. Contingent Claims

In *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 974 F.2d 775 (7th Cir.1992)

9. In fact, MT argues here that its claim could derive from the execution of one or a combination of three major documents: (1) the joint facility agreement signed by Minnesota Transfer's shareholders far in advance of the Milwaukee Road reorganization, (2) Minnesota Transfer's 1982 Board Resolution, or (3) MT's 1988 Board Resolution requiring that the Minnesota Transfer shareholders repay deferred depreciation. When we pressed MT's counsel to take a more precise position at oral argument, he maintained that all three documents were required but that CMC's repayment obligation ultimately arose only in 1988, when MT's Board finally demanded repayment.

10. Upon this we can agree, for the court merely denied CMC's motion for summary judgment without explanation. The Minnesota court ap-

parently believed that there were factual disputes that precluded a resolution short of trial as to whether the obligation to repay deferred depreciation was transferred with the stock or whether it was an obligation that remained with CMC. Resolution of that question is of limited importance here, however, because for MT to have a valid claim, the Minnesota court would be required to accept its premise—that the repayment obligation derived from the 1982 Board Resolution and predated the stock transfer. That is also the premise we accept for purposes of our analysis, and we need not decide any issue of state law in doing so. Moreover, MT is not prejudiced because we essentially are assuming that its position would be accepted by the Minnesota court. In effect, we are giving MT the benefit of the doubt on this threshold question.

(Appeal of Washington State Department of Transportation ("WSDOT")), we discussed the circumstances under which a contingent claim must be filed in a bankruptcy reorganization. In particular, we focused on section 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205, which governs the discharge of claims here:

> Section 77 "clearly provides broad authorization for the discharge in bankruptcy of claims against the debtor in order to secure a fresh start for a company resulting from a [S]ection 77 reorganization." *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 941 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). In order to give the debtor a fresh start, Section 77(f) makes the provisions of a confirmed bankruptcy plan "binding upon the debtor ... all creditors secured or unsecured, whether or not adversely affected by the plan, and whether or not their claims shall have been filed, and, if filed whether or not approved, including creditors who have not, as well as those who have accepted it." 11 U.S.C. § 205(f) (repealed 1978). Section 77(f) further provides that the debtor and its successor corporations emerge from bankruptcy "free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities." *Id.* And, Section 77(b) broadly defines creditors to include "all holders of claims of whatever character against the debtor or its property, whether or not such claims would otherwise constitute provable claims under this Act." 11 U.S.C. § 205(b) (repealed 1978). Finally, Section 77(b) broadly defines claims to include "debts, whether liquidated or unliquidated ... or other interests of whatever character." *Id.*

*WSDOT*, 974 F.2d at 780.

■ We observed in *WSDOT* that a fully-accrued cause of action constitutes a claim

for purposes of section 77. *Id.* at 780; *see also In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 878 F.2d 182, 184 (7th Cir. 1989). Yet we also noted that a party may sometimes have a contingent claim that must be raised in a reorganization proceeding even before a cause of action has accrued. *WSDOT*, 974 F.2d at 781 (citing *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985);[11] *In re Radio–Keith–Orpheum Corp.*, 106 F.2d 22, 22–27 (2d Cir.), *cert. denied*, 308 U.S. 622, 60 S.Ct. 377, 84 L.Ed. 519 (1939)); *see also In re Remington Rand Corp.*, 836 F.2d 825, 831–32 (3d Cir.1988). This is particularly true where the party's claim sounds in contract rather than in tort. *WSDOT*, 974 F.2d at 781; *Schweitzer*, 758 F.2d at 942–43. In *Schweitzer*, the Third Circuit explained that "[o]ne who contracts with a debtor prior to reorganization bargains for a legal relationship with that debtor, relying on the debtor's prereorganization solvency," and that "such a person should not be 'entitled to stand aloof' and avoid the consequences of the bankruptcy proceedings." 758 F.2d at 943 (quoting *Radio–Keith–Orpheum*, 106 F.2d at 26);[12] *see also In re Remington Rand Corp.*, 836 F.2d at 832. Otherwise, the holder of an unaccrued contractual obligation would be granted the equivalent of a preference over " 'unsecured creditors with accrued or determinable claims.' " *Schweitzer*, 758 F.2d at 943 (quoting *Radio–Keith–Orpheum*, 106 F.2d at 26). Such a preference is unwarranted, for the holder of such an obligation only is entitled to " 'treatment as nearly like that accorded to ordinary unsecured creditors as the circumstances permit[ ]....' " *Id.* (quoting *Radio–Keith–Orpheum*, 106 F.2d at 27).

In sum, the origination issue in Minnesota does not control the separate question of whether Minnesota Transfer had a contingent claim as a matter of federal bankruptcy law that should have been filed in the Mil-

---

**11.** In *Schweitzer*, the Third Circuit observed that "it has been held that, under certain circumstances, a person may hold a 'contingent' claim and thereby be a 'creditor' within the meaning of the Bankruptcy Act, even though he presently has no cause of action against the debtor." 758 F.2d at 942.

**12.** A tort plaintiff, on the other hand, "cannot in any reasonable way be said to have bargained for his cause of action." *Id.*

waukee Road reorganization. *See WSDOT,* 974 F.2d at 781–82; *Schweitzer,* 758 F.2d at 942–43.[13] There is case law suggesting that it did (*see Radio–Keith–Orpheum,* 106 F.2d at 26–27), but we express no opinion on that here. However, CMC is entitled to a federal determination of that question before it is forced to litigate MT's claim in Minnesota. The consummation order prohibits the "pursuit" of barred claims, as well as the claims themselves. (R. 3 ¶ 13.)[14] The reorganization court can decide whether MT's contractual claim to deferred depreciation was discharged by the consummation order without deciding an unsettled issue of state law. We therefore disagree with the reorganization court's primary reason for abstaining.

### D. Forum Shopping and Judicial Economy

The reorganization court also was concerned with CMC's delay in bringing its petition for injunctive relief. In fact, the reorganization court observed that "[h]ad CMC promptly brought its petition ..., [it] might have been more inclined to address the merits of the petition." 1992 WL 281514, 1992 U.S. Dist. LEXIS 15161, slip op. at 6. The reorganization court's concern was prompted, it seems, by its view that CMC was forum shopping and that considerations of judicial economy weighed against enjoining state litigation that had been pending approximately nineteen months when the federal petition was filed. These concerns are insufficient to deprive CMC of a federal forum to hear its petition.

First, we are reluctant to characterize CMC's litigation strategy as forum shopping.

Although it was clear from the start that MT's claim was contractual, the complaint referenced both the 1982 and 1988 Board Resolutions, indicating that CMC had failed to respond to MT's demand for payment pursuant to the 1988 Resolution. (R. 10, Ex. D.) CMC moved for summary judgment, arguing that the transfer of its Minnesota Transfer stock predated the 1988 Resolution, which gave rise to the repayment obligation. MT's response made clear that its contractual claim originated not with the 1988 Resolution, but with the 1982 Resolution, effectively bringing the consummation order's bar date into play and prompting CMC to petition the reorganization court for injunctive relief. Perhaps in hindsight CMC could have petitioned for that relief upon the filing of MT's complaint because it knew then that the claim was contractual and that it related in part to the 1982 Board Resolution. It was reasonable for CMC to have assumed, however, that the claim was based on the 1988 Board Resolution and that CMC should therefore defend on the ground that it held no Minnesota Transfer shares when the resolution was passed. Indeed, if the state court had accepted CMC's position on summary judgment, the consummation order would have been irrelevant and there would have been no need for CMC to trouble the reorganization court with its petition. Yet, when MT plainly articulated that its claim originated with the 1982 Board Resolution in fending off summary judgment, the consummation order was implicated, and CMC was justified in then resorting to the reorganization court. Although that court may not have abused its discretion in interpreting CMC's strategy as

**13.** *See also* Arlene Elgart Mirsky, Richard J. Conway, Jr., and Geralyn G. Humphrey, *The Interface Between Bankruptcy and Environmental Laws,* 46 Bus.Law. 623, 651 (1991), where the authors argue that

> [t]he determination of when a claim arises for purposes of bankruptcy law should be a matter of federal bankruptcy law and should not be governed by the particular state or non-Code federal law giving rise to the claim. The reason for this is that the Code definition of "claim" expressly includes rights to payment or equitable relief that are unmatured or unliquidated. Most state or nonCode federal statutes are only concerned with claims that have matured or been liquidated. Therefore, while

looking at the underlying state or nonCode federal law may be helpful in determining when a claim arises, bankruptcy courts should also focus on the reasons for the broad definition of claim in the Code when making such determination.

*See also In re Jensen,* 995 F.2d 925, 930 & n. 5 (9th Cir.1993).

**14.** We have considered MT's argument by way of supplemental authority that the Minnesota court would have jurisdiction to consider whether the claim was discharged. Even if that were the case, we think the issue more appropriately addressed to the reorganization court, which entered the injunction CMC seeks to enforce.

forum shopping, we ultimately are not convinced of that conclusion. In light of our disagreement with the lower court's primary reason for abstaining, we think that any possibility of forum shopping would not support a decision to abstain.

We also would not ground abstention on the fact that some progress has been made in the Minnesota litigation. The record does not support the reorganization court's characterization of that progress as "significant." *Id.* at 5. Discovery has been limited, and the Minnesota court's only foray into the merits has been its one-sentence denial of CMC's motion for summary judgment. The interests of judicial economy would be better served by a prompt resolution of the discharge issue before the parties invest their time and money pursuing a verdict in state court. Indeed, even if MT were to prevail in Minnesota on a claim that originated with the 1982 Board Resolution and that did not pass with the Minnesota Transfer stock, the parties would still need to litigate the discharge issue here. The resources of a reorganized company should not be squandered litigating a claim in state court if the basis for the claim may implicate an earlier discharge order. *Cf. Pan Am.*, 950 F.2d at 847 (applying presumption against abstention where it is likely that the state claim would later be found preempted by federal law). The in-

junctive order would have little meaning and would provide the successor corporation little solace if the reorganization court abstained from enforcing it in circumstances such as these, for as we have stated, the injunction not only bars claims themselves, but also the pursuit of any claims that should have been filed in the reorganization proceeding. (R. 3 ¶ 13.) Because MT has defined the underlying basis for its claim in a way that implicates the discharge order, CMC should not be made to litigate to a verdict in Minnesota before the reorganization court decides if the claim is barred.[15]

■ Abstention is but a narrow exception to the exercise of federal jurisdiction, and the reorganization court should not abstain from interpreting its own consummation order absent extraordinary circumstances. The reorganization court is clearly in the best position both to interpret the consummation order (*see, e.g., WSDOT*, 974 F.2d at 789; *In re Chicago, Rock Island and Pac. R.R. Co.*, 860 F.2d 267, 272 (7th Cir.1988))[16] and to determine whether MT had a contingent claim that should have been filed in the reorganization. If it did, then subject to MT's defenses, the consummation order may bar the Minnesota lawsuit, for that action would be in pursuit of a discharged claim.[17]

---

15. MT suggests that the state litigation should come first, for

> [i]f CMC were to prevail before the state court, there would be no need for further involvement by the Illinois federal courts. If MT prevails, CMC may again petition the federal district court for relief if it so desires.

(MT Br. at 27.) Yet this would serve to nullify the effect of the consummation order. One of the purposes of that order's injunctive provision is to prevent the pursuit of barred claims against the reorganized corporation. The Minnesota court's denial of CMC's summary judgment motion means that CMC would have to incur the substantial cost of a trial in order to prevail.

16. The Ninth Circuit has indicated that a district court generally should not abstain under section 1334(c)(1) when the interpretation of its own injunction is at issue:

> We hold that it was not, as the statute requires, in the interest of justice, or in the interest of comity with state courts, or in the interest of respect for state law, for the court to abstain from judging when it had already issued an

injunction that no other court would be as well qualified to interpret.

*In re China Peak Resort*, 847 F.2d 570, 572 (9th Cir.1988), *vacated on other grounds*, 490 U.S. 844, 109 S.Ct. 2228, 104 L.Ed.2d 910 (1989).

17. CMC requested that in the event we reversed the decision to abstain, we proceed to the merits of its petition. Although the issue has been sufficiently briefed for resolution by this court, we clearly would benefit from the reorganization court's view of the merits. After all, it is the reorganization court's consummation order that is at the heart of this dispute. We thus leave the determination of the merits to the reorganization court on remand.

In addition, the injunction we issued on November 3, 1992 against MT's prosecution of the Minnesota action expires with the issuance of our mandate. We decline CMC's invitation to extend that injunction until the reorganization court rules on the merits of its petition. A motion for preliminary injunctive relief is best addressed to the reorganization court, which can consider such a request in light of our opinion.

### III. CONCLUSION

The reorganization court abused its discretion in abstaining under section 1334(c)(1). We accordingly reverse that court's judgment and remand with instructions that it consider whether Minnesota Transfer had a contingent claim that was discharged by the consummation order.

REVERSED AND REMANDED.