In re TEXACO INC., Texaco Capital Inc., Texaco Capital, N.V., Reorganized Debtors.

TEXACO INC., Movant,

v.

Fred Sharp SANDERS, Charles Joseph Sanders, Monica Browning Sanders, Raymond R. Long, Sadie R. Long, Cynthia Monica Steib, Edwin White, Jr., Monica Glaser Long, Katherine S. Long, John Roy Steib, Jr., Monica Anne Steib, John Roy Steib, III, Chad Raymond Steib, Evan Joseph Steib, Roland Gary, Wanda Mouton Gary, Juanette Mouton Matthews, Billy Matthews, Helen Mouton Thompson, Dennis Thompson, Allan Kanner, Esq., William W. Goodell, Jr., Esq., Donald T. Carmouche, Esq., Victor Marcella, Esq., Patrick W. Pendley, Esq., Donald G. Kelly, Esq. and Dexter A. Gary, Esq., Respondents.

Bankruptcy Nos. 87 B 20142 to 87 B 20144.

United States Bankruptcy Court, S.D. New York.

May 15, 1995.

Weil, Gotshal & Manges by Martin J. Bienenstock, John K. Cunningham, New York City, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P. by Charles S. McCowan, III, Baton Rouge, LA, for Texaco Inc., et al.

McGuire, Kehl & Nealon, L.L.P., by Harold F. McGuire, New York City, Allan Kanner & Associates, P.C. by Allan Kanner, William W. Goodell, Jr., New Orleans, LA, Steffes & Macmurdo, L.L.P. by William E. Steffes, Baton Rouge, LA, Ness, Motley by Paul M. Hulsey, Charleston, SC, for respondents.

### DECISION ON TEXACO'S MOTION TO REOPEN ITS CHAPTER 11 CASE AND TO ENFORCE THE CONFIRMATION ORDER

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Texaco Inc., Texaco Capital Inc. and Texaco Capital, N.V. ("Texaco") seek to reopen the largest bankruptcy case in history in order to enforce the Confirmation Order against twenty individual land owners ("Respondents") and their attorneys engaged in litigation with Texaco in an action pending in

Louisiana state court (the "State Court Action"). With the start of a jury trial looming in the State Court Action, Texaco argues that the prosecution of preconfirmation claims in that suit violates 11 U.S.C. § 524(a)(2) and the injunction provisions of the Confirmation Order in this case. The Respondents counter on procedural as well as substantive grounds, arguing (1) that this Court lacks jurisdiction to provide the requested relief, (2) that under the circumstances this Court should abstain from ruling and (3) that the discharge is not a bar because the claims were unmanifested and unknown. In addition, Respondents have cross-moved for a continuance pending completion of the state court proceedings.

For the reasons stated herein, Texaco's motion is granted to the extent provided in the order referred to below, and Respondents' cross-motion is denied.

## BACKGROUND

### The Texaco Bankruptcy

Texaco is a publicly-held corporation which filed for relief under Chapter 11 of Bankruptcy Code on April 12, 1987. As appears from the disclosure statement, Texaco's filing resulted from the highly publicized $10.5 billion verdict in favor of Pennzoil which a Texas jury rendered on November 19, 1985. Suppliers, uncertain of Texaco's long-term viability and concerned that they might not be paid, began demanding either cash payment in advance or on delivery. As each of its attempts to upset the unprecedented verdict failed, Texaco became increasingly concerned that liens would attach to its assets and that the Company would ultimately be dismembered. The Chapter 11 petitions followed.

After the landmark bankruptcy filing, Texaco continued to prosecute its appeal of the Pennzoil judgment, while also attempting to seek a reasonable settlement of the dispute. Texaco ultimately succeeded in the latter endeavor, and in December 1987 the late Judge Schwartzberg approved the compromise of the Pennzoil judgment for $3 billion in cash. With this agreement in hand, Texaco turned its attention to emerging from bankruptcy. Of relevance here are the January 26, 1988 order (the "Bar Date Order") which fixed March 15, 1988 as the last date for all but expressly excepted creditors to file proofs of claim in the case, the February 5, 1988 order providing that certain oil and gas agreements were not subject to assumption or rejection, and the order approving confirmation of Texaco's Plan of reorganization. The Confirmation Order was signed with much fanfare at 12:20 p.m. on March 23, 1988. Texaco's case was closed for the first time on October 9, 1991.[1]

### The Relationships Between the Parties [2]

The underlying dispute involves tracts of land owned, respectively, by various groups of the Respondents, in Pointe Coupee Parish near Lottie, Louisiana, located in what is known as the Fordoche Oil Field. The Long family property is a truncated "L" shaped parcel of approximately 844 acres. The Gary family property, approximately 420 acres, borders the north side of the Long property. The Sanders family owns a three acre tract at the extreme southeast corner of the Long property, and the small Steib parcel is located at the mid-point on the south border of the Long property.

Since at least the mid–1940's Texaco (or its predecessor) has had a variety of contractual relationships with the Gary and the Long families (or their predecessors) affecting the latters' properties. These agreements have related to oil and gas wells, salt water disposal pits, flow lines or pipe lines, injection wells, tank batteries and related installations and rights-of-way. The principal contract

---

1. Texaco's case has heretofore been reopened twice to enforce the provisions of the Confirmation Order.

2. Because the trial in the State Court Action is currently in progress, I am reluctant to make findings of fact which should be made on the basis of the full trial record in that action and which would invade the province of the jury.

Accordingly, the factual recitations in this decision are intended to provide the necessary background to understand the matters at issue here but are not to be construed as findings of fact binding upon the parties for purposes of collateral estoppel. Any formal findings of fact deemed necessary to decide the matters pending before me will be clearly denominated as such.

with respect to the Long property appears to be the oil, gas and mineral lease dated November 1, 1945, assigned to Texaco in 1946, as amended. The principal contract affecting the Gary property is the surface lease dated April 16, 1984 (the "Gary surface lease").

For purposes of this motion, the most important feature of the lands in question was three salt water storage pits constructed by Texaco (or its predecessor) on the Gary property covered by the Gary surface lease. One pit was constructed in the early 1940's, and the other two in 1966. The salt water storage pits are located adjacent to each other in the southwestern portion of the Gary property less than 300 feet from the borderline between the Gary and Long properties. The pits are square or rectangular in shape and together comprise between six and eight acres. The pits are dug three to five feet below ground level and are bounded by earthen levies three to five feet high, thereby permitting storage of fluids to a depth of six feet or more. The process of oil and gas extraction from drilled wells also entails the production of water containing chlorides and other substances which Respondents assert are pollutants and hazardous. The purpose of the salt water storage pits is to provide temporary storage for this produced water prior to its disposal into injection wells. Produced water is conveyed to the pits by pipelines or flowlines running from oil wells, including wells located on the Long property and adjacent tracts of land.

*The State Court Action*

At the risk of oversimplification, but without prejudice to any claims or defenses asserted in the State Court Action, it is fair to say that the focus of the parties' dispute is the salt water storage pits located on the Gary property adjacent to the Gary/Long property line. The Long, Sanders and Steib Respondents contend that water bearing chlorides and other contaminants migrated from the storage pits to Respondents' properties contaminating the subsurface land and water in the first and second permeable zones underlying their properties.

The initial pleading in the State Court Action was a "petition for damages" filed by Respondent Fred Sharp Sanders against Respondent Roland Gary alleging tort and statutory claims for damages caused by the defendant's actions in allowing salt water to migrate onto plaintiff's property and into his fresh water aquifer. There followed a series of amended petitions, cross claims, counterclaims and answers adding parties and claims, the latest being filed in 1995. The parties' claims have evolved substantially during this time. Texaco was added as a defendant at an early stage and filed its initial answer in September 1993. That answer included the following affirmative defense:

> "Texaco pleads the affirmative defense of discharge in bankruptcy because Texaco has been released from the alleged claims asserted in the petition by a discharge in bankruptcy rendered on March 23, 1988 by the Bankruptcy Court for the Southern District of New York, in the matter entitled *In re Texaco, et al.*, Chapter 11 Case No. 87 B 20142."

Texaco has asserted its discharge as an affirmative defense in every amended answer filed in the State Court Action.

The pleadings in the State Court Action present a welter of contractual, delictual (tort) and statutory claims. As explained by one of Respondents' attorneys, Louisiana is a notice pleading state and, therefore, the pleadings lack evidentiary detail. Perceiving that claims might be asserted based upon statute or sounding in tort or contract which would not be barred by Texaco's 1988 Confirmation Order, at an early stage in this proceeding I requested counsel for the Respondents to prepare a concise summary of their claims to enable Texaco, in good faith, to identify claims which concededly are not subject to the discharge, and to facilitate the Court's task in resolving the parties' dispute as to claims Texaco asserts are discharged. Counsel on both sides complied with the Court's request and, as a consequence, counsel reported at the opening of the hearing on May 8 that the parties had narrowed the issues pending before this Court on this motion to claims based on chromate and on the salt water storage pits located on the Gary Property. Accordingly, it is unnecessary to

consider further the details of the claims asserted in the State Court Action.

Neither party sought judicial intervention with respect to Texaco's affirmative defense of its bankruptcy discharge until Respondents filed a motion, *inter alia*, to strike the defense. The motion to strike was fully briefed and was argued in the State Court on April 19, 1995. After argument, the State Court denied the motion to strike Texaco's defense, stating:

> "I'm not [going to] strike that.... [I]f I would strike it or if they would waive it and by some chance the judge up in New York says, Yes, this should [have been discharged, and] they shouldn't have started up this law suit, I mean, who am I to tell that judge up there what's in that law suit and what's not, what was cleared, what was not, what was discharged, what was not, not me. They want to reserve that as a defense in case he does come back and say that. * * * Well, I do [have jurisdiction to decide the motion to strike], I don't have any doubt about it, but I'm not [going to] knock out something that is not [going to] impede my law suit, it's not [going to] stop anything at this basis. I understand what you're saying. I believe you. And believe me I understand what you're saying. I don't think I can strike a defense like that."

Transcript of official proceedings of April 19, 1995 at pp. 73, 74. The denial of the motion to strike was without prejudice to Respondents proceeding with a motion for partial summary judgment on Texaco's affirmative defense.

### The Instant Motions

While Respondents' motion to strike Texaco's affirmative defense of discharge in the State Court Action was presumably in the last stages of briefing and preparation for the argument on April 19, Texaco filed the instant motion in this Court on April 6. Despite some difficulty and delay in arranging a conference call among all counsel to establish a briefing schedule and return date, the hearing in this Court was set to commence on Friday, April 28 subsequently adjourned to Monday, May 1. Curiously, Respondents moved for a continuance pending completion of the State Court proceedings, asserting that counsel needed time to conduct discovery and otherwise prepare for hearings on this motion.[3] At the conclusion of three very full days of evidentiary hearings on May 1, 2 and 8, both sides rested and the Court reserved decision. On the morning of May 10, the Court advised all counsel by fax that the Court was prepared to sign an Order substantially in the form submitted by Texaco at the conclusion of the hearing on May 8, subject to consideration of any changes as to form which might be requested by Respondents' counsel.

## DISCUSSION

### The Motion to Reopen

The Respondents have not offered any formal argument in opposition to that portion of Texaco's motion seeking to reopen its Chapter 11 case, although they obviously oppose the motion as a whole. Accordingly, at an early stage in the hearing I granted Texaco's motion to reopen its Chapter 11 case, for the limited purpose of allowing this Court to exercise jurisdiction over this matter pursuant to 11 U.S.C. § 350(b).

### Subject Matter Jurisdiction

■ Respondents argue that this type of case is not a "core" proceeding under 28 U.S.C. § 157(b) and, accordingly, that this Court lacks subject matter jurisdiction to hear and determine it. They argue that since the Texaco Plan was fully implemented and the case closed years ago, the outcome of this proceeding and of the State Court Action will in no way affect any distribution or payment to any creditor under Texaco's Plan. Respondents rely primarily on the Ninth Circuit decision in *In re Sequoia Auto Brokers, Ltd., Inc.*, 827 F.2d 1281, 1290–91 (9th Cir.

---

3. The motion for a continuance appears to be curious for two reasons. First, counsel for the parties had already briefed and argued the discharge question in the State Court on Respondents' motion to strike. Second, it would appear to be in the interests of both sides to resolve all questions as to the applicability and reach of Texaco's discharge before, rather than after, the trial in the State Court Action.

1987), while acknowledging and citing decisions of the Fourth and Tenth Circuits and of courts in this Circuit which have held to the contrary. *See Mountain America Credit Union v. Skinner (In re Skinner),* 917 F.2d 444, 447 (10th Cir.1990), *Burd v. Walters (In re Walters),* 868 F.2d 665, 669 (4th Cir.1989), *Bartel v. Shugrue (In re Ionosphere Clubs, Inc.),* 171 B.R. 18, 21 (S.D.N.Y.1994), *Haile v. New York State Higher Education Services Corp.,* 90 B.R. 51, 54 (Bankr.W.D.N.Y. 1988). Recognizing that it is essential for a bankruptcy court to have jurisdiction to adjudicate controversies respecting, and to enforce, its own orders, for the following reasons, I hold that this Court has jurisdiction to entertain and decide this motion.

Section 157(b)(2), on which Respondents rely, states "Core proceedings include, but are not limited to—" followed by fifteen subsections. There is authority holding that a motion for contempt to enforce a Chapter 11 discharge is a core proceeding under 28 U.S.C. § 157(b)(2). *See, In re Kiker,* 98 B.R. 103, 103–04 (Bankr.N.D.Ga.1988); *see also, Miller v. Mayer (In the Matter of Miller),* 81 B.R. 669, 677 (Bankr.M.D.Fla.1988). Of course, irrespective of section 157(b), section 157(a) authorizes the District Court to refer to bankruptcy judges "all proceedings ... arising in or related to a case under title 11," and subsection (b)(3) requires the bankruptcy judge to determine "whether a proceeding ... is a proceeding that is otherwise related to a case under title 11." The relevant grant of subject matter jurisdiction to the district courts is contained in 28 U.S.C. § 1334, and section 1334(b) provides that district courts shall have original but not exclusive jurisdiction "of all civil proceedings ... arising in or related to cases under title 11." There can be no question that a proceeding such as this, to enforce and construe a confirmation order issued by this Court in this case, constitutes a proceeding "arising in or related to a case under title 11." I agree with the authority cited above and hold that this is a core proceeding under section 157(b)(2). *See Kiker,* 98 B.R. at 103–04; *Miller,* 81 B.R. at 677; *see also In re Barbour,* 77 B.R. 530, 532 (Bankr.E.D.N.C.1987); *see also In re Skinner,* 917 F.2d at 448 ("Civil contempt proceedings arising out of core matters are

themselves core matters." (citations omitted))

This Court expressly retained jurisdiction under Texaco's Plan:

1. To take any action to resolve any disputes arising out of or relating to any Claim [;] ... and to take any action to resolve any disputes of creditors with respect to their Claims ... without any other limitation [; and] ...

2. To construe and to take any action to enforce the Plan, issue such orders as may be necessary for the implementation, execution and consummation of the Plan ...

Plan, Article IX at A–18.

In short, the express language of the Bankruptcy Code, the decided cases (other than the Ninth Circuit decision in *Sequoia Auto Brokers* ), the express provisions of the Texaco Plan and sound considerations of public policy compel the conclusion that a bankruptcy court has subject matter jurisdiction to enforce and interpret its own orders. This Court has jurisdiction to entertain this motion to enforce the Texaco Plan as it relates to claims discharged under this Court's order confirming the Plan and 11 U.S.C. §§ 524 and 1141.

*Personal Jurisdiction*

■ Respondents do not contest that they are amenable to personal jurisdiction in this Court by reason of the nationwide service of process provision in Bankruptcy Rule 7004(d). *See Green v. Drexler (In re Feit & Drexler, Inc.)* 760 F.2d 406 (2nd Cir.1985). Respondents' principal argument on the issue of personal jurisdiction is that "... the plain language of [Bankruptcy] Rules 4007 and 7001 mandates that Texaco was required to commence this action as an adversary proceeding, not a contested matter" (Resp.Mem. at 12). Since Bankruptcy Rule 7004 requires service of a summons and complaint in an adversary proceeding, and since Texaco proceeded by motion rather than by service of a summons and complaint, it is asserted that this Court has not obtained personal jurisdiction over the Respondents. Although it is conceded that the alleged defect would be cured if Texaco were to recom-

mence this proceeding by service of a summons and complaint in an adversary proceeding, Respondents declined to waive the alleged defect and, in addition, declined to agree to any adjournment of the trial in the State Court Action scheduled to begin on May 10.

While acknowledging that contempt motions have been used in some reported decisions to enforce a discharge under 11 U.S.C. § 524, viz., *Ionosphere,* 171 B.R. at 20, *Walters,* 868 F.2d at 666, Respondents have cited no case holding that a debtor *must* utilize an adversary proceeding to enforce a discharge under § 524, relying instead on quotations from *Collier on Bankruptcy (15th ed.),* ¶ 4007.07 at p. 4007–21, ¶ 7001.09 at p. 7001–22, which are directed at dischargeability actions under section 523. The portions of Bankruptcy Rule 7001 relied on by Respondents, subsections (1), (6), (7) and (9) do not support their argument. Subsection (1) refers to a proceeding "to recover money or property," which Texaco's motion does not seek to do. Subsection (6) is "to determine the dischargeability of a debt," and concededly this refers to a proceeding under section 523 concerning exceptions to discharge. This is not a proceeding under section 523 to determine whether debts or claims should be excepted from the discharge; it is a motion to enforce the discharge granted to Texaco under section 524. Respondents argue that "... there is no reason to treat an action seeking to declare the ambit of a section 524 discharge any differently" (Resp.Mem. at 12). That assertion is debatable, but moot, because Rule 7001 simply does not provide that a motion to enforce must be brought by adversary proceeding. So also with subsection (7) "to obtain an injunction or other equitable relief" and subsection (9) "to obtain a declaratory judgment relating to any of the foregoing." Texaco's position on this motion is that it already has the injunctive relief necessary in the form of the relevant provisions of the Plan and section 524, which it simply asks this Court to enforce, and to the extent that the Court is required to declare the rights of the parties it is because Respondents have raised issues as to those rights,

not because Texaco seeks a declaratory judgment in its motion.

■ The cases support, by implication, the proposition that a debtor may enforce a discharge under 11 U.S.C. § 524 by means of a contempt motion. *See In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 6 F.3d 1184, 1195 (7th Cir.1993); *accord, Ionosphere,* 171 B.R. at 20; *Kiker,* 98 B.R. at 103–04 (a debtor's motion to reopen a Chapter 13 case to enjoin an alleged violation of the discharge provision of 11 U.S.C. § 524 is a core proceeding 28 U.S.C. § 157(b)(2)); *see also In re Hooker Investments, Inc.,* 116 B.R. 375, 378 (Bankr.S.D.N.Y.1990) (recognizing that a request for sanctions under is not among the enumerated proceedings of Rule 7001, court concluded that due process is not violated where sanctions under 11 U.S.C. § 362(h) are sought by motion); *Collier Bankruptcy Practice Guide* ¶ 40.06 at 40–18 ("Questions of procedure relating to contempt under the Bankruptcy Code are generally regulated by Bankruptcy Rule 9020"; "A contempt proceeding constitutes a contested matter governed by Rule 9014").

Respondents' reliance (Resp.Mem. at 13 n. 1) on *Waterman Steamship Corp. v. Aguiar (In re Waterman Steamship),* 141 B.R. 552 (Bankr.S.D.N.Y.1992) and other cases cited is not compelling. Setting *Waterman Steamship*[4] aside, the remaining cases, namely, *Stockschlaeder v. Kittay (In re Stockbridge Funding Corp.),* 145 B.R. 797, 800 (Bankr. S.D.N.Y.1992), *vacated in part,* 158 B.R. 914 (S.D.N.Y.1993), *Brooks Fashion Stores, Inc. v. Michigan Employment Security Commission (In re Brooks Fashion Stores, Inc.),* 124 B.R. 436, 439 (Bankr.S.D.N.Y.1991), *Miller v. Mayer (In the Matter of Miller),* 81 B.R. 669, 671 (Bankr.M.D.Fla.1988), and *Rhyne v. Cunningham (In re Rhyne),* 59 B.R. 276, 278 (Bankr.E.D.Pa.1986) do involve contempt proceedings which were brought by adversary proceeding. However, none of these cases stands for the proposition that enforcement of an order of discharge brought by a contempt proceeding must be commenced by an adversary proceeding.

4. The *Waterman Steamship* case was vacated at 157 B.R. 220 (S.D.N.Y.1993).

Whether or not Texaco could have proceeded by adversary proceeding, I conclude that the instant motion is properly brought under Bankruptcy Rule 9020 as a contested matter governed by Bankruptcy Rule 9014. Rule 9014 provides that the motion "shall be served in the manner provided for service of a summons and complaint by Rule 7004," and Rule 9014 goes on to make applicable the full panoply of Rules governing proceedings in an adversary proceeding.

■ Further objecting to personal jurisdiction, Respondents asserted in their memorandum that Texaco's motion was not served on the Respondents. However, Texaco has offered an affidavit of service as Exhibit D to its reply submission stating that its motion was served by mail on Respondents Fred Sharp Sanders, Raymond R. Long (Monica G., Katherine S. and Sadie R.), Edwin E. White, Roland/Wanda Gary, Monica B. Sanders (Charles Joseph Sanders), Cynthia Monica Steib (John, Jr., Monica Anne, John Roy, III, Chad Raymond & Evan Joseph) and Billy/Juanette Matthews, and on April 7 on Cynthia Monica Steib (John, Jr., Monica Anne, John Roy, III, Chad Raymond & Evan Joseph) and Helen/James Thompson. ·Although the Respondents or some of them may deny receipt of the motion, the determinative question is whether the process in question, namely the motion, was in fact served by mail, and such service is not contested here. *See In re R.H. Macy & Co., Inc.,* 161 B.R. 355, 359 (Bankr.S.D.N.Y.1993) ("Mail properly addressed, stamped and deposited in the mail system is presumed to have been received by the party to whom it has been addressed.") (citing *Hagner v. United States,* 285 U.S. 427, 430, 52 S.Ct. 417, 418–19, 76 L.Ed. 861 (1932)); *In re Alexander's, Inc.,* 176 B.R. 715, 721 (Bankr. S.D.N.Y.1995) ("It is black letter law that once an item is properly mailed, the law presumes that it is received by the addressee" (citations omitted)); *Capital Data Corp. v. Capital National Bank,* 778 F.Supp. 669, 675 (S.D.N.Y.1991) (even if a statute required receipt, evidence by way of affidavit of service invokes presumption of receipt).

At the end of the final day of hearings on this motion on May 8, Respondents' counsel argued that the mailing of the motion was constitutionally deficient because the motion itself did not recite the date of hearing or state the consequence of failure to respond. There is no question, however, that counsel for Texaco informed Respondents' attorneys by letter dated April 10 of the date scheduled by this Court as the return date of the motion. Under the circumstances here present, including the fact that Respondents' long-time counsel in the State Court Action were timely notified of the hearing date for the motion, I conclude that service of the motion on Respondents by mail in accordance with Bankruptcy Rules 7004 and 9014 satisfied Respondents' constitutional right to notice of the motion. This Court has personal jurisdiction over Respondents.

*Abstention, Laches, Venue*

■ Respondents argue that this Court should abstain from determining this motion under subsections (1) and (2) of 28 U.S.C. § 1334(c), relating to permissive and mandatory abstention. Mandatory abstention under subsection (2) is clearly not applicable here because Texaco's motion is based on section 524 of the Bankruptcy Code and the provisions of Texaco's Plan and the Confirmation Order, not upon a state law claim or cause of action. Although the Louisiana state court undoubtedly has concurrent jurisdiction under 28 U.S.C. § 1334(b) to decide the merits of Texaco's claim of discharge, I am not required to abstain from deciding issues which are of central importance to the integrity of the bankruptcy process.

■ Relevant Supreme Court precedent suggests that the federal courts should be sparing in the exercise of discretionary abstention. *New Orleans Public Service, Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 358, 109 S.Ct. 2506, 2512–13, 105 L.Ed.2d 298 (1989) ("Our cases have long supported the proposition that federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred") (quoting *Chicot County v. Sherwood,* 148 U.S. 529, 534, 13 S.Ct. 695, 697–98, 37 L.Ed. 546 (1893) ("[T]he courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends.

They cannot abdicate their authority or duty in any case in favor of another jurisdiction"); *Willcox v. Consolidated Gas Co.,* 212 U.S. 19, 40, 29 S.Ct. 192, 194, 53 L.Ed. 382 (1909) ("When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction. . . . The right of a party plaintiff to choose a Federal court where there is a choice cannot be denied")). The Supreme Court has described this duty as a "virtually unflagging obligation" of the federal courts to exercise their jurisdiction. *New Orleans,* 491 U.S. at 359, 109 S.Ct. at 2513; *Deakins v. Monaghan,* 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988). As stated by the Court in *Hamilton Allied Corp. v. Kerkau Manufacturing Co. (In re Hamilton Allied Corp.),* 87 B.R. 43 (Bankr.S.D.Ohio 1988):

> [A] contempt proceeding is fundamentally and intrinsically connected to the court issuing the order allegedly violated. Because contempt is an affront to the court issuing the order, enforcement of an injunction through a contempt proceeding must occur in the issuing jurisdiction regardless of the state in which the alleged violation of the court order may have occurred.

(citing *Waffenschmidt v. MacKay,* 763 F.2d 711, 716 (5th Cir.1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986); *Stiller v. Hardman,* 324 F.2d 626, 628 (2nd Cir.1963)). A bankruptcy court is undoubtedly the best qualified to interpret and enforce its own orders including those providing for discharge and injunction and, therefore, should not abstain from doing so. *Chicago, Milwaukee,* 6 F.3d at 1185–86 ("[B]ecause the district court can decide as a matter of federal bankruptcy law whether the Minnesota litigation violates the consummation order without the need to decide any issue of state law, we find that the court abused its discretion by abstaining"); *Id.* at 1194 ("the reorganization court should not abstain from interpreting its own consummation order absent extraordinary circumstances"); *see also In re China Peak Resort,* 847 F.2d 570, 572 (9th Cir.1988), *vacated on other grounds,* 490 U.S. 844, 109 S.Ct. 2228, 104 L.Ed.2d 910 (1989). With respect to comity, the Second Circuit has observed that state courts are not entitled ". . . to any particular deference in interpreting federal law; the notion of 'comity' . . . is 'not strained when a federal court cuts off state proceedings that entrench upon the federal domain.' " *In re Pan American Corp.,* 950 F.2d 839, 847 (2nd Cir.1991) (quoting *Kentucky W. Va. Gas Co. v. Pennsylvania Public Util. Comm'n,* 791 F.2d 1111, 1117 (3rd Cir. 1986)). As aptly stated by Judge Schwartzberg in a materially indistinguishable motion in this case, *Texaco, Inc. v. Griffin, et al. (In re Texaco, Inc.),* 87–B–20142 (Bankr. S.D.N.Y. June 7, 1993), "obviously this Court will not abstain from an issue which involves the scope of the discharge." (Transcript of Hearing at 76).

■ Respondents next argue that "[f]or the same reasons that abstention is appropriate in this case, the doctrine of laches should bar Texaco from obtaining relief from this Court so near to the state court trial date" (Resp.Mem. at 21). At the hearing Respondents submitted a purported affidavit setting forth their legal and other costs incurred in connection with the State Court Action. With respect to the doctrine of laches, the Second Circuit has said:

> A court of equity confronted with a laches issue must consider whether the plaintiff has inexcusably slept on . . . rights so as to make a decree against the defendant unfair. One factor traditionally considered by courts of equity in determining whether the plaintiff's claim is barred by laches is the prejudice to the defendant resulting from the delay.

*Prudential Lines, Inc. v. Exxon Corp.,* 704 F.2d 59, 65 (2d Cir.1983), (internal citations omitted); *Bonwit Teller, Inc. v. Jewelmasters, Inc. (In re Hooker Investments, Inc.),* 162 B.R. 426, 438 (Bankr.S.D.N.Y.1993).

The Respondents complain that Texaco filed this motion in this Court on the very eve of the trial long scheduled in the State Court Action for May 10, before the decision on Respondents' motion to strike Texaco's affirmative defense of the discharge and after Respondents had expended substantial funds in over eighteen months of litigation against Texaco. Respondents' counsel urge that this

Court should "send Texaco a message" that such deplorable litigation tactics will not be countenanced.

The problem with these plaints is that Respondents were put on notice by Texaco's first responsive pleading filed in the State Court Action in September 1993 that Texaco was asserting the defense of its discharge in bankruptcy. Respondents could have tested that defense promptly either in the State Court Action, or in this Court, or in the Louisiana District Court to which the State Court Action was briefly removed. Respondents' failure to do so, advised by able counsel, like Texaco's decision to file the instant motion, was undoubtedly the product of litigation strategy. Respondents' legal costs incurred in the State Court Action could not have been avoided by earlier resolution of the discharge defense, because the parties must proceed with the trial in the State Court Action in any event with respect to the claims not barred by Texaco's discharge.

The obligation of this Court is not to "send messages" admonishing parties for litigation tactics which are lawful, whether deplorable or not, but to decide issues properly before the Court on the merits in accordance with applicable precedent. *See Pan American Corp.*, 950 F.2d at 843 n. 5 ("Although the Realpolitik of high stakes litigation does not escape us, our duty is to ascertain and implement *congressional* intent as expressed in 28 U.S.C. §§ 157(b)(5) and 1334(c)(1)"). It cannot be said that either side acted unlawfully in filing their respective motions addressed to the discharge defense, and there is no basis for a finding that Respondents have suffered any equitably cognizable prejudice from both sides' delay in confronting the question of Texaco's discharge. *See Alithochrome Corp. v. East Coast Finishing Sales Corp. (In re Alitho-chrome Corp.)*, 53 B.R. 906, 909 (Bankr. S.D.N.Y.1985). Absent such a showing, a judicial desire to extirpate litigation gamesmanship is not a sufficient ground to invoke the equitable doctrines of either abstention or laches.

With respect to venue, Respondents do not claim that venue in this Court is not proper under 28 U.S.C. § 1408, but they assert that venue should be transferred to Louisiana because virtually all of the witnesses are located there and are not subject to subpoena in New York. Bankruptcy Rule 1014(a)(1); 28 U.S.C. § 1412.

The authorities cited and discussed above on the issue of abstention strongly support the proposition that the issuing court is in the best position to interpret and enforce its own orders. In this case, that precept is also applicable to the venue objection, given the unusual aspects of the unprecedented Texaco bankruptcy and the arguments advanced by counsel on the merits of this motion, discussed below. Moreover, a movant's choice of forum is entitled to some deference. *In re Garden Manor Associates, L.P.*, 99 B.R. 551, 555 (Bankr.S.D.N.Y. 1988); *see In re Thomson McKinnon Securities, Inc.*, 126 B.R. 833, 836 (Bankr.S.D.N.Y. 1991) (quoting *In re Manville Forest Products Corp.*, 896 F.2d 1384, 1391 (2nd Cir. 1990)) ("the district in which the underlying bankruptcy case is pending is presumed to be the appropriate district for hearing and determination of a proceeding in bankruptcy" (citations omitted)). The party moving for change of venue bears the burden of demonstrating facts sufficient to invoke the Court's equitable discretion. *Manville*, 896 F.2d at 1390; *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 149 B.R. 365, 368–69 (Bankr.S.D.N.Y.1993). Venue motions are entrusted to the discretion of the Court and are to be decided upon the particular facts of each case, in light of broad considerations of convenience, fairness and proper judicial administration. *Id.* at 368.

Although some guidance is provided by the factors set forth in *Commonwealth of Puerto Rico v. Commonwealth Oil Refining Co. (In re Commonwealth Oil Refining Co.)*, 596 F.2d 1239, 1247 (5th Cir.1979), *reh'g denied*, 601 F.2d 1195, *cert. denied*, 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980) as well as those discussed by Judge Schwartzberg in *Thomson McKinnon Securities, Inc.*, 126 B.R. at 835–36, neither framework is particularly helpful in this proceeding. To the ex-

tent that these authorities are relevant, they support the retention of venue in this Court.

It is true that all of the witnesses called by both sides in three days of hearings were from Louisiana. It is also true that it was more costly and less convenient for the several counsel for Respondents to travel from their respective offices in New Orleans, Baton Rouge and Charleston, South Carolina to White Plains than to the courthouse in Plaquemine, Louisiana. But high stakes controversies in this era often involve proceedings in distant locations, and the burden of travel in the mid–1990's is greatly mitigated by the convenience and speed of the airplane. The Court scheduled the hearing days to accommodate the calendars of Respondents' counsel to the extent possible in light of the imminence of the May 10 trial date. All of the witnesses called by Respondents at the hearing were produced by Texaco at Texaco's expense, and I am not aware that Respondents were prejudiced by inability to call any witness which they would have called had the matter been litigated in Louisiana. In short, Respondents did not make a sufficient showing to warrant a change of venue.

*The Merits*

Texaco asserts that Respondents' pre-confirmation claims are barred by 11 U.S.C. § 1141(d)(1), which provides, in pertinent part:

> (d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—
>
> (A) discharges the debtor from any debt that arose before the date of such confirmation ... whether or not—
>
> (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title; ... (emphasis added)

This Court's Order confirming Texaco's Plan stated:

> [I]n accordance with section 1141(d) of the Bankruptcy Code, each of the Debtors be, and it hereby is, discharged of and from any and all debts and Claims that arose against it before the date of entry of this order, ... whether or not (i) a proof of

claim based on such a debt is filed or deemed filed under section 501 of the Bankruptcy Code (ii) such Claim is allowed under section 502 of the Bankruptcy Code or (iii) the holder of such Claim has accepted the Plan.

Confirmation Order ¶ 22

The effect of Texaco's discharge is set forth in section 524(a) of the Bankruptcy Code, entitled "Effect of discharge." Section 524(a)(2) expressly provides that the discharge operates as a permanent injunction against the commencement or continuation of any action to recover discharge claims. The statute provides:

> (a) A discharge in a case under this title—
>
> \* \* \* \* \* \*
>
> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; ...

The legislative history of section 524 of the Bankruptcy Code leaves no question as to the finality and sweeping effect of the statutory discharge and permanent injunction:

> "The injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts.... [Section 524(a)] is intended to insure that once a debt is discharged, the debtor will not be pressured in any way to repay it. In effect, the discharge extinguishes the debt, and creditors may not attempt to avoid that."

H.R.Rep. 595, 95th Cong., 1st Session. 365–66 (1977); S.Rep. No. 989, 95th Cong., 2nd Session 80 (1978).

The Confirmation Order (¶ 25) mirrors Bankruptcy Code section 524(a)(2), stating:

> "The commencement or continuation of any action, the employment of process, or any act to collect, recover or offset any debt discharged hereunder as a personal liability of any of the Debtors, or from property of any of the Debtors be, and it

hereby is, permanently enjoined, stayed and restrained."

Finally, as Texaco asserts, the provisions of its Plan are binding on all creditors holding claims against Texaco. 11 U.S.C. § 1141(a). Section I of Article VII of the Plan provides:

I. *Discharge.*

Except as otherwise provided in the Plan or in the Confirmation Order, Confirmation shall operate as a discharge, pursuant to Bankruptcy Code § 1141(d)(1), effective as of the Effective Date, of any and all debts of and Claims against one or more of the Debtors that arose at any time before Confirmation, including, but not limited to all principal and interest, whether accrued before, on, or after the Filing Date. On the Effective Date, as to every discharged debt and Claim, the creditor that held such debt or Claim shall be precluded from asserting against any Debtor formerly obligated on such debt or with respect to such Claim, or against such Debtor's assets or properties, any other or further Claim based upon any document, instrument or act, or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

Based on these provisions of the Bankruptcy Code, the Confirmation Order and the Plan, Texaco argues that all of Respondents' pre-confirmation claims are barred by Texaco's discharge in bankruptcy.

Respondents forcefully present many points of fact and law in support of their argument that their claims asserted in the State Court Action were not discharged in the Texaco bankruptcy. All of these points revolve around the fundamental unfairness of depriving Respondents of claims which were "unmanifested" and "unknown" to Respondents at the time of the Bar Date Order and the Confirmation Order in early 1988. For purposes of analysis, Respondents' arguments can be organized under three subheads: (1) the scope and meaning of the term "claims" as defined in the Bankruptcy Code and construed in the case law; (2) the constitutional adequacy of the notice given to

Respondents of the impending discharge of their claims in 1988; and (3) the treatment of contractual claims.

Before turning to these topics, it is important to acknowledge that in some circumstances it may indeed be unfair, and impermissible, to apply the discharge provisions of the Bankruptcy Code where a claimant would thereby be barred from asserting otherwise valid claims which, as a practical matter, through no fault of the claimant, could not be asserted prior to confirmation. There is a tension between the need to protect the property and constitutional rights of claimants, on the one hand, and the philosophy of granting discharged debtors a "fresh start" which underlies the bankruptcy laws in the United States. There is no question that the concept of the debtor's discharge is fundamental to that philosophy and, in particular, to the practical implementation of a plan of reorganization under Chapter 11.

The need to balance these conflicting values based upon the particular facts of each case has given rise to difficult issues, and a great deal of litigation. Judges of course must play a central and ongoing role in resolving controversies as they arise. But ultimately the courts are obliged to construe the statute so as to implement the intent and purpose of Congress, within Constitutional bounds.

*The Definition of "Claims"*

As noted above, 11 U.S.C. § 1141(d)(1)(A) states that confirmation of a plan "discharges the debtor from *any debt* that arose before the date of such confirmation" (emphasis supplied). The word "debt" is defined in 11 U.S.C. § 101(12) as "liability on a *claim*" (emphasis supplied). The word "claim" is defined in section 101(5) to mean:

"(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equi-

table remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured"

Numerous decisions in many jurisdictions have expounded at length upon the extraordinary breadth with which Congress intended to invest the term "claim" by means of this definition. *Grady v. A.H. Robins Co., Inc.,* 839 F.2d 198, 200 (4th Cir.1988) (citing *Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 707–08, 83 L.Ed.2d 649 (1985); *Robinson v. McGuigan,* 776 F.2d 30, 34 (2d Cir. 1985), *rev'd on other grounds sub nom., Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *Matter of M. Frenville Co., Inc.,* 744 F.2d 332, 336 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); *In re Edge,* 60 B.R. 690, 692–94 (Bankr.M.D.Tenn.1986); *In re Johns–Manville Corp.,* 57 B.R. 680, 686–88 (Bankr. S.D.N.Y.1986)). The leading decision in this Circuit with respect to the subject matter of this motion is *In re Chateaugay Corp.,* 944 F.2d 997, 1003 (2nd Cir.1991), where the Court of Appeals said:

"Congress unquestionably expected this definition to have wide scope. 'By this broadest possible definition … the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.' H.R.Rep. No. 595, 95th Cong., 2d Sess. 309 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5963, 6266. *See also Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991); *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 557, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). That language surely points us in a direction, but provides little indication of how far we should travel."

Turning to the facts in this case, there can be no question that Respondents' claims based upon chromate contamination and migration of subsurface contaminants from the Gary salt water storage pits arose *prior* to the Confirmation Order, whether or not those claims are meritorious or dischargeable. Chromate was used or produced only in connection with the Texaco gas plant located to the West of the Long property, and it appears that any chromate effluent was piped to the Gary pits. The gas plant was closed several years before the Confirmation Order, and any production or use of chromate which could affect Respondents' properties terminated at that time. The Gary pits were drained, residual sludge was mixed with fly ash and the pits were capped with clay and topsoil in late 1984 and early 1985. The testimony and evidence presented by Texaco's expert witness, Michael Pisani, which was not contradicted by any evidentiary submission by Respondents, demonstrated that any migration of fluid from the Gary pits into the subsurface waters in the first and second permeable zones would have commenced at or near the outset of Texaco's use of the pits in 1941 and 1966 and continued throughout such use, and that the degree and rate of any such migration would have been a factor of (i) the pressure or "head" resulting from the depth of produced water in storage from time to time and (ii) the varying subsurface water table levels under and adjacent to the pits. Hence, any incremental damage to Respondents' land would have substantially abated with closure of the pits. Indeed, it appears to be uncontested that a recovery well constructed by Texaco in 1989 has had the effect of reducing any subsurface contamination at the Long and Gary properties.

Based on all of the evidence before me, I find as a fact that all claims based on Texaco's use of chromate and on alleged contamination emanating from the salt water storage pits must necessarily have arisen prior to the Confirmation Order. All of the physical events required to establish the elements of causation and damage for such claims occurred prior to confirmation.

Under the broad statutory definition of "claim" on which the definition of "debt" is based, it should follow that Respondents' claims arising from chromate and pit contamination are barred by Texaco's discharge under 11 U.S.C. §§ 524(a) and 1141(d)(1)(A). Simply stated, Respondents' argument to the contrary is that a claim which is "unmanifested" and "unknown" to the claimant does not fall within either the literal or the intended

meaning of the words used in the definition of "claim" contained in section 101(5).

It is asserted that the subsurface contamination emanating from the pits was not (and still is not) manifest to physical observation of the surface of the land. Texaco agrees that subsurface contamination, if any, is not manifest at the surface, and Texaco's witness, Wayne Martin Grip, and the photographic evidence he produced (Exhibit 43) substantially confirm this. However, the fact that the alleged contamination damage to Respondents' property was not manifest at the surface does not mean that it was not capable of detection prior to confirmation. There can be no dispute that the alleged subsurface contamination was susceptible of detection by a variety of scientific testing methods which could be performed by environmental engineers. In fact, Respondents affirmatively allege that (i) Texaco discovered the subsurface contamination as a result of work performed by its environmental consultants, Woodward Clyde, in 1986, and (ii) that plaintiff's own environmental experts verified the existence of the alleged subsurface contamination in 1993, which provoked the commencement of the State Court Action. Based upon the evidence presented, I find as a fact that any subsurface contamination of Respondents' property that existed prior to the Confirmation Order could have been detected and reasonably quantified or evaluated prior to the Confirmation Order either by Texaco or by the Respondents.

Accordingly, I reject Respondents' argument insofar as it is based on the assertion that their claims were "unmanifested" at the surface. The claims in question were fully matured and uncontingent. They were "provable" even under the Bankruptcy Act, and are clearly within the broader Bankruptcy Code definition of "claims," which includes both contingent and unmatured claims. *See Johnson v. Home State Bank, supra.*

■ Respondents also assert that the alleged subsurface contamination was "unknown" to them. Evidence of Respondents' lack of knowledge was tendered in the form of an affidavit by one of their attorneys and affidavits by each of the Respondents purportedly attesting to their lack of knowledge.

Texaco objected when Respondents' affidavits were submitted in evidence on the obvious ground of hearsay, since none of the Respondents appeared in this Court to testify under oath and subject to cross-examination. However, Texaco offered no evidence that any of the Respondents actually did know of migration of contaminants from the pits to any of Respondents' lands, and Texaco itself denies "knowledge" of any actionable subsurface contamination of Respondents' property because it denies that there was such contamination. For purposes of this motion, this Court assumes (without finding as a fact) that prior to the Confirmation Order none of the Respondents had knowledge of subsurface contamination of their property emanating from the Gary salt water storage pits.

The question, then, is whether claims which are neither contingent nor unmatured, but which are unknown to the claimants, were intended by Congress to be covered by the statutory definition of "claim" so as to be barred by the discharge. The decisions leave no doubt that environmental claims such as Respondents', even if unknown, are within the statutory definition. The leading case involving environmental claims, which is controlling in this Circuit, is *In re Chateaugay, supra.*

Clearly, the Congressional intent was that the definition of a "claim" under section 101(5) of the Bankruptcy Code has a broad scope. "By this broadest possible definition ... the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong., 2d Sess. 309 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5963, 6266. *See In re Chateaugay Corp.*, 944 F.2d at 1003.

The *Chateaugay* Court was faced with the issue of whether unincurred CERCLA response costs for pre-petition releases are "claims." The Court found that these costs are indeed claims, dischargeable in bankruptcy, regardless of when such costs were incurred, as long as such costs concerned pre-petition release or threatened release of hazardous waste.

The District Court recognized that "before a contingent claim can be discharged, it must result from pre-petition conduct fairly giving rise to that contingent claim." *Chateaugay*, 112 B.R. at 521. The Court of Appeals noted that the District Court "carefully limited its ruling to pre-petition releases or threatened releases of hazardous substances." *Chateaugay*, 944 F.2d at 1005. Other decisions involving environmental claims support the conclusion reached by the Second Circuit in *Chateaugay*. *CMC Heartland Partners v. Union Pacific Railroad (In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.)*, 3 F.3d 200, 207 (7th Cir.1993) (environmental claims discharged even though "Union Pacific may not have had actual knowledge of hazardous waste containers at the railyard"); *In re Jensen*, 995 F.2d 925, 929 (9th Cir.1993) ("the bankruptcy claim arises at the time of the debtor's conduct relating to the contamination"), affirming *In re Jensen*, 127 B.R. 27, 33 (Bankr. 9th Cir.1991) ("a claim arises for purposes of discharge upon the actual or threatened release of hazardous waste by the debtor"); *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 974 F.2d 775, 786 (7th Cir.1992); *NCL Corp. v. Lone Star Bldg. Centers (Eastern) Inc.*, 144 B.R. 170, 180 (S.D.Fla.1992) (dismissing hazardous substance counterclaims based upon pre-petition releases or threatened releases following the reasoning in *Chateaugay, supra*, that "the Code contemplates discharge of unmatured or contingent claims which are not asserted"). *See also In re National Gypsum Co.*, 139 B.R. 397, 408 (N.D.Tex.1992) (employing the "fair contemplation" standard; relevant factors include "knowledge by the parties of a site in which a PRP may be liable"). *Cf. United States v. Union Scrap & Metal*, 123 B.R. 831 (D.Minn.1990); *In re M. Frenville Co.*, 744 F.2d 332 (3rd Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). In *In re Penn Cent. Transp. Co.*, 42 B.R. 657, 675 (E.D.Pa.1984), *aff'd*, 771 F.2d 762 (3d Cir.), *cert. denied*, 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 576 (1985), involving unknown antitrust claims, the court held that

"[u]nder [the Bankruptcy Act] and the Bankruptcy Code, claims which are asserted after confirmation and consummation are discharged and there is no exception made for claims which were unknown to a claimant until after consummation of the Plan."

*See also, In re Edge*, 60 B.R. 690 (Bankr. M.D.Tenn.1986) (bankruptcy "claim" arose at the time of negligent work by dentist even though the injury was discovered post-petition, so as to stay malpractice action against the debtor under 11 U.S.C. § 362).

Respondents rely heavily on *In the Matter of Johns–Manville Corporation*, 68 B.R. 618 (Bankr.S.D.N.Y.1986), *aff'd* 843 F.2d 636 (2nd Cir.1988) and *In re A.H. Robins Company, Inc.*, 88 B.R. 742 (Bankr.E.D.Va.1988), *aff'd*, 880 F.2d 694 (4th Cir.1989), asserting that the unmanifested and unknown claims there involved are similar to Respondents' claims and pointing out that the courts in those cases fashioned trust funds to provide relief for claims filed post-confirmation.[5] However, the potential claims involved in those mass tort cases are materially different from Respondents' claims. The user of a Dalkon Shield, or the worker at a building site or factory who is exposed to asbestos particles, may never develop the disease caused by the hazardous material, or if she or he does become ill, the disease may not occur until long after the use or exposure. In such a case the claim is not merely unknown, it is incapable of detection because the damage caused by the use or exposure (*i.e.*, the disease) physically has not yet occurred so as to give rise to a cause of action. By contrast, in this case the evidence demonstrates that all of the physical events giving rise to Respondents' rights of action, if any, occurred prior to the Confirmation Order and were capable of detection by scientific means available to Respondents in 1988 and, in fact, utilized by Respondents in 1993. "As the Second Circuit explained in *Chateaugay*, unmatured tort, contract, and statutory claims are all dischargeable in bankruptcy

---

**5.** Respondents also ask me to "pay particular attention" to *In re Allegheny International, Inc.*, 158 B.R. 356 (Bankr.W.D.Pa.1993). However, this case was vacated, at 170 B.R. 83 (W.D.Pa. 1994).

even if the creditor is unaware of the claim." *NCL Corp.,* 144 B.R. at 180.

To summarize, on the facts in this case there can be no doubt that Respondents' claims based on chromate and contamination from the salt water storage pits are well within the broad statutory definition of "claim" prescribed by Congress in section 101(5), which includes "contingent" and "unmatured" rights to payment. Respondents' claims were neither contingent nor unmatured as of the Bar Date, and even if unknown to Respondents at that time, their claims were unquestionably capable of detection.

### The Due Process Requirement of Notice

 As Texaco's Exhibit D demonstrates, the "Notice of Bar Date for the Filing of Proofs of Claim," as approved by this Court's Bar Date Order dated January 26, 1988, was mailed on or about January 28, 1988 to Respondents Sadie R. Long, Cynthia Monica Long Steib, Raymond R. Long, Roland Allen Gary and Edwin E. White, Jr. at the addresses listed in Texaco's records for mailing Respondents' royalty checks. The royalty checks for each Respondent for January and February 1988 were endorsed by and paid to each. Respondents do not contest the fact of mailing of the Notice, but the five Respondents apparently deny that they received the Notice, as they apparently denied receipt of Texaco's motion. However, "Mail properly addressed, stamped and deposited in the mail system is presumed to have been received by the party to whom it has been addressed." *In re R.H. Macy & Co.,* 161 B.R. at 359. *See, In re Alexander's, Inc., supra,* and *Capital Data Corp. v. Capital National Bank, supra,* which are also cited and discussed above in the section on personal jurisdiction.

 Texaco asserts that the remaining Respondents (other than the three Sanders) are deemed to have received actual Notice by reason of their relationships to the five to whom Notice was actually mailed. The following paragraphs appeared in "Plaintiffs' Proposed Findings of Fact and Conclusions of Law" signed and submitted by Respondents' counsel in the State Court Action in connection with Respondents' motion to strike Texaco's defense of discharge:

"4. Notice of the establishment of the "Bar Date" was actually mailed in January, 1988 by Texaco to the following parties—Long, Raymond R.; Long, Sadie R.; Steib, Cynthia Monica; White, Edwin E. Jr.; and Gary, Roland.

5. By virtue of their relationship to one or more of the parties named above to whom actual notice of the "Bar Date" was given, the following parties may be deemed to have received notice: Long, Katherine S. (Raymond Long's current wife); Long, Monica Glaser (Raymond Long's deceased wife); Steib, John Roy Jr. (Husband of Cynthia Monica Steib); Gary, Wanda Mouton (Wife of Roland Gary); Steib, Monica Anne; Steib, John Roy, III; Steib, Chad Raymond; and Steib, Evan Joseph (the last four being children of Cynthia Monica Steib).

6. Arguably, the following parties may be deemed to have received actual notice of the "Bar Date" by virtue of their relationship to Roland Gary; Matthews, Juanette Mouton (Sister-in-law); Thompson, Helen Mouton (Sister-in-law); Matthews, Billy (Brother-in-law); Thompson, James Dennis (Brother-in-law)."

(Texaco Exhibit 10)

Based upon the foregoing, I find as a matter of fact and law that all of the Respondents except the three Sanders received or are deemed to have received actual Notice by mail of the Bar Date Order.

 The three Sanders Respondents, having no royalty entitlement, were not on Texaco's mailing list and did not receive a mailed Notice of the Bar Date. The evidence at the trial demonstrated, and I find as a fact, that Texaco had no reason to know that the Sanders were prospective claimants with respect to chromates or the Gary salt water storage pits. The Sanders parcel of land, located in the southeast corner of the Long property farthest removed from the Gary property, was approximately 9,440 feet

from the pits, and no evidence was presented remotely suggesting that Texaco had any reason to believe that produced water stored in the pits might have migrated two miles underground to the Sanders tract. Indeed, the evidence in the record demonstrates the contrary, although I need not and do not make this finding.

In addressing the issue of whether a creditor is deemed "known" or "unknown" to the debtor for notice purposes, the Bankruptcy Court in *In re Drexel Burnham Lambert Group, Inc.*, 151 B.R. 674 (Bankr.S.D.N.Y. 1993), stated:

> Several basic principles underlie the determination of whether a creditor is known or unknown. Unknown creditors are creditors whose claims are not reasonably ascertainable or are speculative and conjectural. It is, therefore, reasonable to dispense with actual notice to unknown creditors, provided that the debtor makes 'reasonably diligent efforts' to uncover their identities and claims.
>
> Reasonable diligence in ferreting out known creditors will, of course, vary in different contexts and may depend on the nature of the property interest held by the debtor. Applying *Mullane's* 'reasonable under the circumstances' standard, due process requires a reasonable search for contingent or unmatured claims so that ascertainable creditors can receive adequate notice of the bar date. What is reasonable depends on the particular facts of each case. A debtor need not be omnipotent or clairvoyant. A debtor is obligated, however, to undertake more than a cursory review of its records and files to ascertain its known creditors.

*Id.* at 680–81 (citations omitted). *See also In re Thomson McKinnon Sec. Inc.*, 130 B.R. 717 (Bankr.S.D.N.Y.1991). *See also Charter Crude Oil Co. v. Petroleos Mexicanos (In re Charter Co.)*, 125 B.R. 650, 656 (M.D.Fla. 1991) ("Even assuming that [the debtor] knew there was a possibility of a claim by [the claimant], [the debtor] was not required to give actual notice to creditors with merely conceivable, conjectural or speculative claims.").

■ Although a debtor is obligated to ascertain reasonably the identity of its creditors by reviewing its own books and records, "a debtor is not required to search elsewhere for those who might have been injured." *In re Best Products Co.*, 140 B.R. 353, 358 (Bankr.S.D.N.Y.1992); *In re Brooks Fashion Stores, Inc.*, 124 B.R. at 445 ("it is not the debtor's duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it"), quoting *In re Charter Co.*, 125 B.R. at 655.

Based upon the foregoing, I find as a matter of fact and law that the Sanders were unknown creditors of Texaco and, as such, Texaco's publication of notice in accordance with this Court's Bar Date Order constituted sufficient compliance with the Sanders due process right to notice to discharge their claims. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) ("notice reasonably calculated, under all the circumstances"). The Supreme Court "has not hesitated to approve of resort to publication as a customary substitute" for actual notice. *Id.* at 317, 70 S.Ct. at 659. *See also, Tulsa Professional Collection Svc., Inc. v. Pope*, 485 U.S. 478, 490, 108 S.Ct. 1340, 1347–48, 99 L.Ed.2d 565 (1988) ("For creditors who are not 'reasonably ascertainable,' publication notice can suffice"); *Best Products*, 140 B.R. at 358; *Brooks Fashion Stores*, 124 B.R. at 445 (state taxing authority with unknown tax claim); *Charter Int'l Oil Co. v. Ziegler (In re Charter Co.)*, 113 B.R. 725, 728 (M.D.Fla. 1990) (unknown tort claimants who were not aware of their pre-petition claims prior to expiration of the bar date); *Novak v. Callahan (In re GAC Corp.)*, 681 F.2d 1295, 1300 (11th Cir.1982).

■ Notwithstanding the apparent constitutional and statutory sufficiency of the Notice by mail and publication described above, Respondents argue that this Notice was so defective as to deprive Texaco of its bankruptcy discharge with respect to their claims. The factual premise of Respondents' argument is that Texaco knew of Respondents' claims, and Respondents did not. The legal grounds of the argument are the due process clause of the Fifth Amendment to

the Constitution, section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, relating to the debtor's duty to file schedules of liabilities and creditors, and section 1125 of the Code relating to the disclosure statement.

Preliminarily, it should be noted that Respondents overstate the case with regard to Texaco's purported "knowledge," of Respondents' alleged "claims". The 1986 report of Texaco's consultants, Woodward Clyde, on which Respondents principally rely, was an electromagnetic conductivity survey which revealed diminishing "plumes" of chloride (salt) concentrations extending in a narrow arc perhaps 1400 feet into the Long property. As Respondents concede, indeed, aver, the subsurface water migration evidenced by this plume had no manifest adverse impact on the surface of the land, or the use of the land, and the testimony of Texaco's witnesses showed that any seepage into the first or even second permeable zones could not possibly have had any impact on water sources at far deeper levels used for livestock or human consumption. In short, there is no evidence that any seepage or contamination that did take place on the Long property had a material economic consequence such as to give rise to a viable claim for damages, although I make no finding in this regard.[6]

With regard to the constitutional issue, Respondents place heavy emphasis on the extensive procedures utilized in "mass tort" cases to advertise and solicit claims arising out of products manufactured and sold by the companies there involved, citing *Vancouver Women's Health Collective Society v. A.H. Robins Company, Inc.*, 820 F.2d 1359, 1361 (4th Cir.1987) and *In the Matter of Johns–Manville Corp.*, 68 B.R. 618, 628 (Bankr.S.D.N.Y.1986) *aff'd* 843 F.2d 636 (2nd Cir.1988). But as Respondents concede, Texaco's bankruptcy "did not bear even a remote resemblance to the 'mass tort' cases" (Resp.Mem. at 31), and we are not concerned here with the requirements of F.R.C.P. 23 applicable in class actions, which Respon-

dents invoke. As noted above, the latent and undetectable potential for disease which might give rise to a claim in the context of asbestos or the Dalkon Shield bears no resemblance to the matured and noncontingent claims of the Respondents in this case. As to the large scale advertising and solicitation of claims in the *Robins* and *Manville* cases, it is sufficient to point out that those Companies and the potential claimants were strangers to each other. The claimants had no contact with the Companies and would not necessarily even know the source of the products. As already noted, they would be incapable of detecting the consequence of their exposure to the product if they were not yet afflicted with any resulting illness. And, of course, neither Robins nor Manville would have any way to identify persons who had used or been exposed to their products.

By contrast, Respondents and Texaco were not strangers. Texaco gave actual notice to the Respondents to the extent it could do so, and Respondents were well aware of Texaco and the Gary salt water storage pits. They had contracts with and received royalty checks from Texaco. The pits were constructed in 1941 and 1966, situated in open and flat terrain, adjacent to a public road, bounded by levies three to five above ground level, encompassing an area of six to eight acres. The pits were plainly visible and served as storage for produced water for that portion of the Fordoche oil and gas field in which Respondents, or many of them, resided. The pits were connected to the oil wells in the area by a network of pipes and flowlines some of which were on Respondents' properties. The fact that oil wells produce water containing chlorides and possibly other noxious substances requiring storage prior to injection into deep wells cannot be described as arcane knowledge, given the open and notorious existence of huge pits constructed for precisely that purpose.

In short, it simply cannot be said that these Respondents required the kind of no-

---

6. This is not to say that the apparent migration from the pits did not constitute an environmental "problem," or that Texaco was unaware of the problem. Texaco forwarded the Woodward Clyde report to the Louisiana Department of Environmental Quality ("DEQ") in December 1986, communicated thereafter on an ongoing basis with officials of the DEQ and has been implementing a program of remediation approved by the DEQ since 1988 or 1989.

tice provided in the *Robins* and *Manville* cases to satisfy due process. Respondents have not cited any case supporting the proposition that the Notice approved by this Court in the Bar Date Order was constitutionally defective. To the contrary, the Notice comported fully with the language quoted at page 17 of Respondents' supplemental memorandum from *Mullane v. Central & Trust Co., supra,* at 314, 70 S.Ct. at 657 ("apprise interested parties of the pendency of the action and afford them an opportunity to present their objections") and *In re Johns–Manville Corp., supra,* 129 B.R. at 801 (". . . the content of the notice must clearly describe the nature of the proceeding; how it will affect any rights that the recipients may have; and when, where, and how such persons may express their objections"). To paraphrase *In re Charter Co.,* 125 B.R. at 656, quoted above, even assuming that Texaco knew there was a possibility of a claim by Respondents, Texaco was not required to give actual notice to creditors "with merely conceivable, conjectural or speculative claims". *A fortiori,* Texaco had no Constitutional duty to give Respondents some unique, special notice tailored to environmental claims.

██ Little need be said of Respondents' reliance on provisions of the Bankruptcy Code and Rules with respect to adequacy of notice. Section 524(g) of the Code, added by the 1994 amendments, concerns asbestos litigation and is irrelevant in point of both time and subject matter. As to 11 U.S.C. § 1125, it is ludicrous to suggest that Texaco's disclosure statement was deficient for failure to mention the environmental "problem" in the Fordoche Field.

██ Nor can it fairly be said that Texaco acted in bad faith for purposes of 11 U.S.C. § 521 or Bankruptcy Rule 1007 by failing to list Respondents in its schedules of creditors on the evidence presented. The plume of electromagnetic conductivity disclosed in the Woodward Clyde report, with no evidence of material economic damage, was not such portentous evidence of a claim as to mandate disclosure under section 521. Texaco had some 55,000 oil and gas leases and undoubtedly thousands of other work sites where there might have been some evidence of some environmental problem. But "it is not the debtor's duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it". *In re Brooks Fashion Stores, Inc.,* 124 B.R. at 445. Moreover, even if it could be said that Texaco violated section 521 and Rule 1007 by failing to schedule Respondents as creditors, Respondents have cited no authority to support their argument that such failure should bar Texaco's discharge, particularly since Respondents did receive actual notice by mail or, in the case of the Sanders, constructive notice by publication.

*Contract Claims*

██ Respondents argued that Texaco assumed Respondents' oil and gas leases, that "long standing principles . . . require that such contracts be assumed *cum onere* " and that performance of those contractual obligations "was expressly excepted from any discharge Texaco received" (Resp.Mem. at 28). Texaco responded by pointing out that this Court's Order dated February 5, 1988 provided that Louisiana oil, gas and mineral leases "are not subject to Bankruptcy Code section 365." As a consequence, there was no cure requirement and all pre-confirmation claims were discharged without affecting the continued vitality of the mineral leases. The order was apparently based on the decision in *Delta Energy Resources, Inc. v. Damson Oil Corp.,* 72 B.R. 7 (W.D.La.1987), among others. Respondents cite *Texaco Inc. v. Louisiana Land and Exploration Co.,* 136 B.R. 658 (M.D.La.1992) for a contrary rule. But the latter case post-dates this Court's order and, in any event, the February 5, 1988 order was entered on motion with notice to all concerned parties including Respondents and whether or not based on good law, is binding in this case.

As noted above, conceiving that there might possibly be contractual claims which would not be subject to discharge, at an early stage of the proceedings and again at the close of the hearing on May 8 I asked counsel for Respondents to identify any particular contract provisions which Respondents claim

give rise to obligations not discharged. Counsel did not identify any such provisions.

Accordingly, I conclude that any contractual claims which Respondents may have based upon chromates and the emanation of fluids from the Gary salt water storage pits are barred by Texaco's discharge in bankruptcy, except claims based on the Gary surface lease.

With respect to the Gary surface lease, Texaco acknowledges that this contract was assumed by Texaco and that claims under the contract are not discharged, and Texaco's proposed order submitted at the conclusion of the hearing on May 8 so provides. However, Texaco argues in its Reply Memorandum (p. 21) that "none of the Garys' pit-related claims, including punitive damage claims, constitute defaults under the Gary Lease which Texaco is required to 'cure' under Bankruptcy Code section 365(b)(1)" (emphasis omitted). This Court declines to rule upon such contentions, which have not been briefed by the parties here and which raise issues of state law to be decided, if necessary, in the State Court Action.

Finally, Texaco has submitted a Stipulation and Order dated September 20, 1994 and another dated February 7, 1995 signed by counsel for certain of the Respondents and entered by the Court in an action in the United States District Court for the Middle District of Louisiana, and Texaco asserts that some or all of the claims of those Respondents are thereby barred in the State Court Action. The interpretation and effect of those contractual/judicial documents are matters of state law to be determined, if necessary, in the State Court Action or by the District Court.

### RELIEF

The Court will sign an order substantially in the form submitted by Texaco at the close of the hearing on May 8 after giving due consideration to any requests for amendments as to form by counsel for Respondents.